557 F.2d 747
 L. J. HARR, Jeanne Harr, Lawrence J. Echohawk, Ed Fulton,
Diane Fulton, Don Hutchison, C. Gerald Parker,
Donald Drew, Carrie Drew, and Douglas
McGregor, Petitioners-Appellants,
v.
FEDERAL HOME LOAN BANK BOARD, an agency of the United
States, Respondent-Appellee,
and
Prudential Federal Savings and Loan Association, Intervenor.
 No. 76-1109.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted March 16, 1977.
Decided June 27, 1977.
Rehearing Denied July 22, 1977.
 
 Howard S. Landa, Salt Lake City, Utah (Parker M. Nielson and A. Reed Reynolds, Salt Lake City, Utah, with him on brief), for petitioners.
 Daniel J. Goldberg, Acting Gen. Counsel, Federal Home Loan Bank Bd., Washington, D. C. (Harold B. Shore, Associate Gen. Counsel, Harvey Simon, Senior Trial Atty., and Roland L. Marcotte, Jr., Atty., Federal Home Loan Bank Bd., Washington, D. C., with him on brief), for respondent.
 Richard W. Giauque, Salt Lake City, Utah (Douglas J. Parry and Randall L. Dunn, Berman & Giauque, Salt Lake City, Utah, with him on brief), for intervenor.
 Before SETH and BARRETT, Circuit Judges, and KERR, Senior District Judge*.
 SETH, Circuit Judge.
 
 
 1
 This is a petition for review of order No. 75-1164 of the Federal Home Loan Bank Board, and is filed pursuant to 12 U.S.C. § 1730a(k). The order approved a plan whereby Prudential Federal Savings and Loan Association, a federally chartered organization, would become a federally chartered stock association. See also the opinion of this court in Harr v. Prudential Savings & Loan Ass'n, 557 F.2d 751 (10th Cir.), decided this date. This conversion was sought under Section 402(j) of the National Housing Act (12 U.S.C. § 1725(j)). The approved plan provided for the issuance, without charge, of shares of stock to depositors as of July 13, 1972.
 
 
 2
 The petitioners are two depositors who had savings balances on July 13, 1972, and who increased the balances after that date; they are four depositors who made their first deposits after July 13th and the other petitioners apparently are borrowers from Prudential.
 
 
 3
 The petitioners urge that the conversion plan was unfair in that it was operative on April 15, 1976, but the stock distribution was to depositors as of July 13, 1972. They also urge that the conversion by the issuance of "free" stock was improper, and they particularly argue that the proxy solicitation material was misleading and false. Petitioners also assert that there was no authority whereby their interests as depositors in a mutual association could be converted into the form of stock.
 
 
 4
 The Bank Board and the Intervenor assert that this review of the Board's order should not proceed because the petitioners did not file objections to the conversion plan while it was under consideration by the Bank Board. There is no showing in the record that any objections or comments were so filed.
 
 
 5
 It is obvious that administrative remedies must be exhausted under virtually all instances where judicial review is sought. This Circuit has so held in several cases. See Bank of Commerce v. Board of Governors of Federal Reserve System, 513 F.2d 164 (10th Cir.), and Bank of Commerce v. Smith,513 F.2d 167 (10th Cir.). These cases, of course, are related to the Whitney National Bank decision (Whitney National Bank in Jefferson Parish v. Bank of New Orleans, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386). This court has also applied the doctrine in other types of litigation, as Garvey v. Freeman,397 F.2d 600 (10th Cir.). This doctrine is based on the assumption that the officials and agencies in the administrative chain should have an opportunity to consider the issues and claims and to so exercise their discretion before the matter is submitted to the courts. The administrative expertise is so directed to the particular points sought to be raised and an adequate record is developed. The interested parties in ordinary circumstances also have the responsibility to determine the proper procedure.
 
 
 6
 We must hold in this review that the doctrine described above is not applicable because of the unusual circumstances. We have examined the several notices which were sent to depositors or published by Prudential at the direction of or under the Bank Board regulations. These notices are adequate to advise the depositors that a plan of conversion was submitted. The August 15, 1975, notice advised the depositors that they could file objections, although it is not clear with whom the filing should be made. The notices are adequate to put the depositors on notice of a change, but the notices are misleading as to a remedy. This is not an instance of silence as to possible remedy, but an affirmative misleading statement, the statement being that court review would be available. This was an unconditional statement that such a remedy could be used, and no conditions were expressed. This, together with the time lapses, served to mislead the petitioners as to the proper course of action.
 
 
 7
 Under these circumstances, if an agency is to urge the application of this type of exhaustion doctrine here described to preclude court review, it cannot advise the interested parties, as it did here, that there is an unconditional right to court review. Again, this is not an instance of silence, but affirmative advice which was wrong.
 
 
 8
 From this we must conclude that the petitioners may proceed with this petition for review. They have advanced apparently all the issues they wish to raise, and the Board and the Intervenor have met them. The notices were adequate in all other respects.
 
 
 9
 The Board approved the conversion plan as having met the statutory requirements and as being permitted under the grandfather provisions in the final amendments. Thus the issuance of "free" stock by Prudential was authorized by the legislation. The "free" stock aspect of the conversion was contrary to any overall policy established by Congress, but, as indicated, was authorized in a few specific instances. The plan was approved by the Bank Board as fair and reasonable in all respects as the exercise of its discretion. We find nothing in the legislation to indicate that approval was mandated by Congress. We also hold that this was done in conformance with the enabling legislation. Within the scope of our review, we find no abuse which would cause us to set aside the plan as it was approved, or otherwise modify it.
 
 
 10
 It is obvious that the lapse of time between the original application and final approval caused several problems. These were no more than "problems," and were not of such a nature as to invalidate the conversion plan. The record date of July 13, 1972, was mandated by Congress for this conversion. Notice had been given on August 10, 1972, that the Board of the Association had decided to convert. The legislative history shows that Congress felt it necessary, despite the delay, to stay with the July 13, 1972, date because of the unfairness which could result from depositors increasing their deposits after the date, or which could come about from new deposits made to speculate on the possibility of the stock issue. Congress also considered the possibility that some depositors, who had made deposits after the record date, would withdraw them when they otherwise would not have done so in reliance on the established date. But in any event, it is clear that the record date was so established by Congress. It is not persuasive to argue that Prudential did not have to proceed with the conversion. Clearly it did not have to do so, but it was the decision of management and ultimately of the depositors and borrowers. This was permitted by statute and regulations.
 
 
 11
 Another consequence of the delay between the time the plan was filed and the conversion was the fact that depositors who had become such after the record date were solicited and voted their proxies. The number of such new depositors is not indicated in the record; however, we do not see how the petitioners can complain of this. It again was a by-product of the resolution of the record date problem by Congress. It was within the approval of the plan, and there is no showing that it was prejudicial to petitioners. Apparently several of the petitioners are such "new" depositors. At the Association meeting on March 5, 1976, there were 1,328,997 votes of members cast on the conversion question; of this vote 1,176,199 voted for the conversion. A majority of the "outstanding" votes (1,694,229) was required for approval; thus about sixty-nine percent of the total eligible vote was cast in favor of conversion.
 
 
 12
 The petitioners argue that the Bank Board did not have exclusive authority over the approval of the plan of conversion, and particularly over the proxy solicitation. Petitioners assert that the matter was in part governed by the Securities Acts.
 
 
 13
 As we have pointed out above there was specific legislation relating to conversion of this nature, and giving the Bank Board the authority to approve or disapprove, and generally to exercise their existing supervisory authority over such changes. The consideration of a plan for conversion cannot be separated from the proxy solicitation and proxy material. All of this package was well within the supervisory authority of the Board during all times material to this case.
 
 
 14
 The Bank Board was directed by 15 U.S.C. § 78l (i) (Public Law 93-495) to supervise and administer proxy solicitation, among other things, during the conversion process. This legislation accomplished a transfer of this authority from the SEC to the Bank Board. The Board issued its own regulations and exercised the authority given it by statute in the consideration and authorization of the proxy material. These regulations are independent of section 14 of the Exchange Act. The National Housing Act, 12 U.S.C. § 1725(j) (1), authorizes the Bank Board to issue rules as to conversions. These regulations, in the form here concerned, were issued on February 28, 1974. The solicitation and vote took place before March 5, 1976.
 
 
 15
 Thus the Bank Board had exclusive authority to regulate the conversion including the proxy solicitation. This was done under statutory authority given to the Board, and not derived from other Acts as petitioners urge. We find no defect in the procedure or exercise of supervisory authority in this respect to warrant the relief requested by petitioners.
 
 
 16
 The petitioners direct much of their argument to the proxy material and the proxy solicitation. The Bank Board asserts that, based upon "a careful staff study of Prudential's proxy solicitation material . . . ," it determined that this material and statement were in accordance with the regulations, and the Board "authorized" the "use" of this material.
 
 
 17
 It would not seem useful to discuss each of the many points raised as to the adequacy of the proxies and as to the asserted misleading material. We have examined the points and the record carefully and we find no omission or misleading statement sufficient to warrant the relief suggested.
 
 
 18
 The petitioners urge also that their rights of property were changed by the conversion. As to the petitioners who were depositors before the closing date, their interests were changed from that of a depositor in a mutual association to that of a stockholder in a stock association. This change was one authorized by law upon the proper vote of the depositors. These petitioners held their interests in the mutual association subject to the vote of the majority as provided by regulation. Their rights were thus at all times subject to this possibility as are the rights of shareholders generally.
 
 
 19
 As to the petitioners who made deposits after the closing date, little need be said except that they took subject to the announced change, and apparently upon an express waiver.
 
 
 20
 The relief requested by the petitioners is denied, and the petition for review is dismissed.
 
 
 
 *
 Of the District of Wyoming, Sitting by Designation