Sylvia DAVIS, et al., Plaintiffs,

v.

THE UNITED STATES of America, et al., Defendants.

No. CIV–96–1988–M.

United States District Court, W.D. Oklahoma.

April 25, 2002.

Jonathan T Velie, William Velie, Velie & Velie PC, Norman, OK, Mark A Strauss, Franklin B Velie, Mark H Goldey, Salans Hertzfeld Heilbronn, Christy & Viener, New York, NY, for plaintiffs.

Arvo Q Mikkanen, U.S. Attorney's Office, Oklahoma City, OK, Margaret M Sweeney, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Linda A Epperley, Muskogee, OK, for U.S., defendant.

Arvo Q Mikkanen, U.S. Attorney's Office, Oklahoma City, OK, Margaret M Sweeney, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Charles R Babst, Jr, U.S. Department of Interior, Tulsa Field Solicitors Office, Tulsa, OK, Dept. of Interior, defendant.

Arvo Q Mikkanen, U.S. Attorney's Office, Oklahoma City, OK, Margaret M Sweeney, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Bureau of Indian Affairs, Bruce Babbitt, ADA Deere, Roy Willis, Jim Fields, defendants.

## ORDER

MILES–LaGRANGE, District Judge.

Before the Court is defendants' "Post–Remand Motion to Dismiss or, in the Alternative, for Summary Judgment," filed February 15, 2000 [docket no. 73]. On February 15, 2000, plaintiffs filed their "Memorandum of Law in Opposition to Defendants' Motion for Failure to Join an Indispensable Party" [docket no. 71], and on March 15, 2000, plaintiffs filed their "Memorandum of Law in Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment" [docket no. 82]. On January 15, 2002, the Court ordered plaintiffs to file a brief explaining the bases of jurisdiction, including the requisite waiver of sovereign immunity, for each of their causes of action [docket no. 85]. On January 18, 2002, plaintiffs filed their "Supplemental Memorandum of Law Addressing the Jurisdictional Question Raised by the Court by Order Dated January 15, 2002" [docket no. 86]. On January 24, 2002, defendants filed their "Response to Plaintiffs' Supplemental Memorandum of Law Addressing the Jurisdictional Question Raised by the Court Order Dated January 15, 2002" [docket no. 88]. The Court, having thoroughly reviewed the parties' briefs, the extensive evidentiary record, relevant cases and governing law, makes its determination herein.

## I. NATURE OF THE CASE

This cause of action was filed by the Dosar Barkus Band and the Bruner Band (the "Bands," "Freedmen," "Black Seminoles," or "Freedmen Bands"), two subsections of the Seminole Nation of Oklahoma (the "Seminole Nation," the "Tribe," or "Seminole Tribe"), and Sylvia Davis as Guardian and Next Friend for Donnell E. Davis, who is a member of the Dosar Barkus Band (collectively "plaintiffs") against the United States, the Department of the Interior, the Bureau of Indian Affairs ("BIA") and numerous administrators and employees of the Department of the Interior and the BIA (collectively "defendants"). Members of these Bands are members of the Seminole Nation who are of African or mixed African/Native American ancestry. Plaintiffs did not name the Seminole Nation of Oklahoma as a defendant.

Plaintiffs allege they are entitled to receive benefits from a $56 million judgment awarded to the Seminole Tribe in 1976. The money represents reparations awarded to the Seminole Tribe arising out of a claim filed by the Seminole Tribe against the United States for tribal lands taken in 1823 ("Judgment Fund" or "Judgment Fund Award"). Plaintiffs assert they are victims of racial discrimination and have been illegally excluded from participating in the Judgment Fund Award and programs funded by the same. Plaintiffs further assert they are entitled to receive Certificate of Indian Blood cards ("CDIB cards"), which entitle the cardholder to receive various benefits provided by the Seminole Nation. Plaintiffs allege the BIA has denied issuance of CDIB cards to members of the Seminole Nation who are of African descent. Plaintiffs seek both declaratory and injunctive relief. Plaintiffs request the Court order defendants to require the Seminole Nation to allow them to participate in the Judgment Fund Award and to provide plaintiffs benefits deriving from the Judgment Fund Award in a nondiscriminatory manner on the same basis that such benefits are provided to other members of the Seminole Nation. Plaintiffs further request the Court order defendants to deem them eligible for CDIB cards.

## II. HISTORICAL BACKGROUND [1]

### A. Seminole Nation

The Seminole Nation is an Indian tribe comprised of people of both Native American and African descent. The Seminole Nation was formed after the European conquest of America. The members of the Seminole Nation who are of African descent are the descendants of African slaves who escaped the bondage of slavery and who resided among several Native American groups living in what is now known as Florida. The Seminoles are unique among Indian tribes in that they were not aboriginal. Instead, they are an entirely post-European phenomenon. The Seminoles were comprised of various separatists, secessionists and runaways from a variety of ethnic, political and linguistic Native American and African groups.

### B. Black Seminoles

The Black Seminoles are descendants of African slaves. The African slaves, attempting to gain their freedom, escaped from Southern and Carribean slave masters in the 18th and 19th Centuries to present-day Florida. These escaped slaves became a part of the Native American culture, assimilating with the Native Americans that were inhabiting the area. The Black Seminoles contributed to the

---

1. The Court's recitation of the history of the Black Seminoles, as members of the Seminole Nation, is taken from the parties' evidentiary submissions.

Native American culture acting as warriors, interpreters, negotiators and spies for them. They even dressed in Native American fashion. While some of the escaped slaves lived nominally as slaves of the Native Americans, many lived as free men and women. The Black Seminoles lived in their own villages, tilled their own fields, carried guns, were entrepreneurs and were homeowners.

It was in the 18th Century that this diverse group of Native American and African people, speaking several Native American and African languages, became known as "Seminoles." The People of African descent became known in the Seminole tongue as "Estelusti," which translates to "Black Seminoles."

Following the Civil War, the Black Seminoles were emancipated by the Thirteenth Amendment of the United States Constitution. Thereafter, all Black Seminoles (both those who had been slaves and those who had not) became known as "Freedmen."

### C. Seminole Tribe Removal

Florida became a United States territory in 1821. Two years later, in the 1823 Camp Moultrie Treaty, Seminole lands in Florida were ceded to the United States. As a result of this transfer, the Seminoles, including the Black Seminoles, were forcibly removed from their home in Florida to what is present-day eastern Oklahoma. This forced removal, which occurred from 1838–1842, has come to be known as the "Trail of Tears." A small number of Seminoles continue to reside in Florida.

### D. The 1866 Treaty

In 1866, the Seminoles and the United States entered into the Treaty of March 21, 1866, 14 Stat. 755 ("1866 Treaty").

The 1866 Treaty contains the following provision:

> inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color, who may be adopted as citizens or members of said tribe.

The 1866 Treaty is the genesis of the formal recognition of plaintiffs' ancestral membership in the Seminole Nation.

Although the 1866 Treaty formally recognized plaintiffs' ancestors as members in the Seminole Nation who were to "have all the rights of native citizens," the Dawes Commission created two separate rolls for the Seminole Nation (the "Dawes Rolls").[2] The Dawes Rolls separated the Seminoles into two categories. The Seminoles of African descent were included in the "1906 Seminole Freedmen Roll," while the non-African descent Seminoles were included in the "1906 Seminole Blood Roll." A Seminole who was half Native American and *half African* was counted as a Freedman, while a Seminole who was merely one quarter Native American (but *three quarters white*) was included on the Blood Roll. The Dawes Commission made no effort to quantify and record the percentage of Native American blood of those listed on the Freedmen Roll, though many historians agree that many of those listed on the Freedmen Roll had mixed Native American ancestry. The Dawes Rolls are still considered the authoritative benchmark

---

**2.** Congress created the Dawes Commission in 1893 to create authoritative membership rolls for all Native American tribes in Oklahoma.

for determination of membership in the Seminole Nation.

### E. *Judgment Fund Award*

In 1950 and 1951, the Seminole Nation and the Florida Seminoles filed separate claims with the Indian Claims Commission, seeking compensation for tribal lands in Florida ceded to the United States in 1823. On April 27, 1976, twenty-six years later, the Indian Claims Commission ruled in favor of the Seminoles and awarded $16 million to the "Seminole Nation as it existed in Florida on September 18, 1823." *Seminole Nation of the State of Florida and Seminole Nation of Oklahoma v. United States*, 387 Ind. Cl. Comm. 91 (Dockets 73 and 151). With interest, the judgment funds totaled approximately $56 million and were appropriated by Congress in the Act of June 1, 1976, 90 Stat. 597, 629.

Following the favorable Judgment Fund ruling, the BIA issued its "Research Report on the Seminole Judgment in Dockets 73 and 151 before the Indian Claims Commission" ("Results of Research Report"), in which the BIA advised Congress on how the funds should be fairly distributed. The Results of Research Report concluded that the Black Seminoles were not eligible to share in the Judgment Fund Award. On November 26, 1976, the BIA disclosed the results of its report in a memorandum to the Eastern Area and Muskogee Area Directors. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Failure to Join an Indispensable Party, Exhibit A. The Results of Research Report discussed, in significant detail, the background of the Seminole Judgment in Dockets 73 and 151 and pertinent aspects of early Seminole history and culture. This report was later submitted to and extensively relied upon by Congress. The Results of Research Report represents the first evidence that the BIA intended to exclude the Black Seminoles from the benefits of the Judgment Fund Award. Realizing that it needed to reconcile the problem of the Black Seminoles' enrollment on the "Dawes Commission Roll" as "citizens," but not "by blood," and the Seminole Nation of Oklahoma Constitution which made no such distinction and provided that membership consists of "all Seminole citizens whose names appear on the final rolls of the Seminole Nation of Oklahoma ...," the BIA identified what it envisioned would be two fundamental problems that it would have to overcome if the Black Seminoles were to be excluded. Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit A at 9–10. "Two very fundamental enrollment problems, ..., must be recognized in the context of handling the judgment funds: (1) 'Seminole citizens' include the Freedmen; and (2) the Seminole Nation had no provisions for constructing a current roll until after the filing of their claim in Docket 151." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit A at 10.

Despite acknowledging the inclusion of the Black Seminoles as citizens in the Seminole Nation of Oklahoma, the Results of Research Report concluded "all Seminole Negroes and their descendants, including living Freedmen and their descendants who are eligible for membership in the modern Seminole Nation of Oklahoma, to be ineligible to participate in the subject award." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit A at 11. While the BIA took the position that the Black Seminoles should be excluded as beneficiaries of the Judgment Fund Award, it was equally aware that such an exclusionary plan would not receive the required Congressional vote. As further evidence of the BIA's position, Rosella C. Garbow, BIA Tribal Operations Officer, wrote in a memorandum, dated May 4, 1990, "[w]e sincerely believe that should a plan be submitted to Congress that excludes the Seminole Freedmen, who are currently members of the [T]ribe, a joint resolution

will be enacted by Congress disapproving such a plan." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit B at 1–2. As evidenced by Garbow's additional statements in the May, 1990 memorandum, this was an urgent matter to the BIA. Garbow further wrote:

> We need some clarification regarding this matter *immediately* as tribal employees have informed us that most of the persons inquiring about the status of this Act are Seminole Freedmen. We have already attended meetings to discuss the formulation of a tribal plan. This is the predominant concern of most of the Seminole by blood members, and has to be addressed before any meaningful tribal disbursement plan can be prepared.

Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit B at 2 (emphasis added). Realizing its exclusionary proposal would not be approved by Congress, the BIA assisted the Seminole Nation in formulating a plan that could prevent the Black Seminoles' participation in the Judgment Fund Award and still receive Congressional approval. *See* Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit C.

In 1990, Congress passed the "Indian Claims Distribution of Funds to Seminole Indians," 104 Stat. 143 (1990) (the "Distribution Act") setting forth criteria for the use and distribution of the Judgment Fund Award.[3] The Distribution Act delegated the responsibility to the Seminole Nation of Oklahoma to prepare a distribution plan for its 75% share of the Judgment Fund Award. However, the provisions of the Distribution Act did not directly address the Black Seminoles' entitlement to share in the tribal programs. The Act provided that "not less than 80 per centum thereof shall be set aside and programmed to serve common tribal needs, educational requirements, and such other purposes as the circumstances of the Seminole Nation of Oklahoma may determine." Distribution Act § 4(a). Despite the directive to utilize the funds for common tribal needs, educational requirements and other such purposes, the BIA and the Seminole Nation sought to exclude the Black Seminoles as beneficiaries of these programs. *See* Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit G at 3.

On June 28, 1990, during a visit to Wewoka by Garbow, Chief Jerry Haney[4] held a meeting in his office in which Ross Swimmer[5] participated via telephone. The exclusion of the Black Seminoles from participation in the Judgment Fund Award was discussed. *See* Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit E. Swimmer stated a usage plan excluding the Black Seminoles would probably pass because the "taking" of Seminole lands occurred in 1823, and the Black Seminoles were not formally recognized citizens of the Seminole Nation at that time. Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit E. He also stated all of the members of Congress were aware of the facts surrounding the taking and the proposal would pass even though the Black Seminoles were not included. *See* Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit E. Following conference call, the parties held a "serious discussion" on whether or not the Black Seminoles should share as beneficiaries in

---

3. Despite the BIA's submission of its Results of Research Report in 1976, the political dispute over the appropriate division between the Seminoles in Florida and the Seminole Nation of Oklahoma prevented any legislation or plan for distribution or expenditure until the 1990 Act, some 14 years later.

4. The Court was unable to determine from the record Chief Jerry Haney's title, but believes Chief Haney is the Chief of the Seminole Nation.

5. The Court notes that it was unable to determine from the record Ross Swimmer's title.

the Judgment Fund Award in some form.[6] Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit E.

On September 4, 1990, Garbow again visited Wewoka, Oklahoma. In her report of the visit, dated September 10, 1990, Garbow stated the purpose of the trip was to meet with the Seminole Judgment Fund Committee[7] to discuss a tentative tribal proposal for the use and distribution of judgment funds awarded to the Seminole Nation of Oklahoma under Dockets 73 and 151. See Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit D. During the meeting, the exclusion of the Black Seminoles was the predominant subject. Garbow's report stated "[t]he Freedman issue is a very sensitive matter, and the Committee does not want to include them in the usage plan." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit D. During that meeting, Janet Spaulding, Solicitor's Office, Tulsa, Oklahoma, made several comments on the "options/choices" that the Seminole Nation had regarding the exclusion of the Black Seminoles. Her comments reflect the exclusionary intent of the Seminole Nation and the BIA's assistance to the Seminole Nation in the exclusion of the Black Seminoles from participating in the Judgment Fund Award. Spaulding advised the Seminole Nation that there was the "possibility of the plan slipping through if Congress [was] busy with the Middle East crises on their mind." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit D. She further advised the Seminole Nation that it would perhaps be subject to a lawsuit no matter what it decided to do. Pls.' Mem. Opp'n

Mot. Dismiss Ind. Party, Exhibit D. "If the Seminoles are sued, the Courts will determine what was the intent of Congress in using language members by blood or members of the Seminole Nation. Congress might look at past legislation which states members by blood." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit D. In that same meeting, a member of the Judgment Fund Committee suggested allowing the time to prepare the usage plan to expire so that the BIA would be forced to prepare the plan. See Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit D. Spaulding discouraged this thinking by stating if the Black Seminoles sued the BIA as a result of the usage plan, "the money could be tied up until something was resolved." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit D.

Ultimately, the Tribe voted to exclude the Black Seminoles from benefitting from the Judgment Fund Award. The Seminole Nation General Council approved the Seminole Nation Usage Plan (the "1991 Usage Plan") on October 20, 1990. It was submitted to Congress on January 30, 1991, and became effective 60 days later, on or about March 30, 1991, as provided in Section 4(d) of the Distribution Act. Following Congressional approval of the 1991 Usage Plan, the Seminole Nation General Council passed several ordinances establishing programs to be funded by the Judgment Fund Award. The programs include an elderly assistance program, a children's clothing program, a burial program, a higher education program and a household economic assistance program.[8] Tribal res-

---

6. The parties even discussed including the Black Seminoles as beneficiaries just not equally with the Seminoles by blood. See Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit E.

7. Although the Freedmen Bands were two of the recognized 14 Bands that comprise the Seminole Nation of Oklahoma, the Seminole

Judgment Fund Committee specifically excluded representation of the Freedmen Bands. See Defs.' Post Remand Mot. Dismiss at 12, Exhibit 9.

8. This Court notes that the General Council Secretary refused to sign the Burial Assistance Program and the School Clothing Program ordinances. "Normally, the General

olutions authorizing each program contain eligibility requirements for participation. For example, the Tribal Higher Education Assistance Program contains the following eligibility requirement ("Eligibility Requirement"), which must be met by all persons before they are allowed to participate in the program: "The applicant must be an enrolled member of the Seminole Nation of Oklahoma who has been determined to have descended from a member of the *Seminole Nation as it existed in Florida on September 18, 1823*." Because the Black Seminoles were not expressly recognized as members of the Seminole Nation until the 1866 Treaty, the effect of the Eligibility Requirement is to exclude the Black Seminoles from participating in any Judgment Fund Program that conditions participation on meeting the Eligibility Requirement.

On August 7, 1991, the Area Director of the Muskogee Area Office, requested Tim Vollmann, Regional Solicitor, Southwest Region, render an opinion concerning the advisability of releasing Judgment Funds for the Seminole Nation's utilization pursuant to its exclusionary Eligibility Requirement. On August 30, 1991, Vollmann responded to the Eligibility Requirement as follows:

> The underlying question raised by this eligibility requirement concerns the rights of tribal members listed on the Freedmen Roll [the Black Seminoles] or their descendants to participate in tribal programs funded with the Indian Claims Commission judgment monies appropriated by Congress ... The question presented is whether the eligibility standards in the ordinances are consistent with the 1990 Act and the plan and are otherwise consistent with the law. You need to know this before releasing any of the judgment funds to the Seminole

Nation because the courts have held that the federal government has a fiduciary duty in administering the trust funds of an Indian tribe ... we believe that the proposed definition of eligibility is acceptable.

Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit G at 1, 3, 10.

It is clear from Vollmann's August 30, 1991 memorandum that there was concern that the Eligibility Requirement "might be contrary to Congressional intent and could be seen as invidiously discriminatory." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit G at 9. In fact, Vollmann states that his "staff counseled ... informally against releasing funds pursuant to such proposed ordinances." *Id.* Concluding that insufficient evidence existed demonstrating that Congress intended to exclude the Black Seminoles, Vollmann stated:

> the legislative history provides evidence, *but it is far from overwhelming*, that Congress intended to exclude, or to permit the exclusion, of the Freedmen from sharing in the Oklahoma Seminole's share of the award. Two considerations weigh against that reading of the legislative intent behind the 1990 Act. First, if Congress had intended to exclude the Freedmen, it certainly could have done so explicitly in light of the fact that it had previously excluded Creek Freedmen from participation in that Tribe's claim award distribution. Secondly, the language of section 4(b) of the [1990] Act requires that, before a per capita distribution of the investment income from 20% of the award principal may be made by the tribal governing authority, the Secretary must certify 'a roll of members of the Seminole Nation of Oklahoma born on or before and living on the date of enactment of this Act'. Since

Council Secretary would attest to the ordinances but the General Council Secretary re-

fused to sign them." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit F.

Freedmen, as modern members of the Tribe, would be on that roll, this is some evidence that they were considered to be beneficiaries of any per capita payment plan. It would be anomalous to consider them eligible for per capita distributions but not for tribal programs ... *Thus the reference to the Secretary's certification of a contemporary membership roll of the Seminole Nation of Oklahoma supports the proposition that the Freedmen not be excluded from participation in the benefits of the claims award, including the tribal programs.*

Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit G at 8 (emphasis added).

Vollmann, nevertheless, in the same memorandum concluded that the Eligibility Requirement was acceptable because the intent of Congress was not clearly established. *See* Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit G at 10. The language change from expressly excluding Black Seminoles to language which provided eligibility would be based on descent from a member of the Seminole Nation as it existed in 1823 made the proposed plan more acceptable to Vollmann. He stated he believed "this exercise of tribal discretion is supported by the legislative history of the 1990 Act." Pls.' Mem. Opp'n Mot. Dismiss Ind. Party, Exhibit G at 10.

Although the Distribution Act and the 1991 Usage Plan control the distribution of the Judgment Fund Award, both the BIA and the Seminole Nation play a role in the distribution of such funds. The BIA's role is to determine, prior to the release of tribal funds, whether the planned expenditures are in accordance with the Distribu-

tion Act and the 1991 Usage Plan. It is the BIA's responsibility to determine whether adequate funds are available, and process tribal requests for draw-downs from the United States Treasury. The Seminole Nation is responsible for processing applications for Judgment Fund programs and determining applicant eligibility. The Seminole Nation requires a CDIB card as a prerequisite to participation in the Judgment Fund Award.

### F. Certificate of Degree of Indian Blood

A CDIB card serves as the BIA's certification that an individual possesses a specific quantum of Indian blood.[9] The BIA does not rely on whether the applicant is a member of an Indian tribe. Rather, any person who can trace his or her ancestry to a Seminole Indian listed on the Dawes Rolls is entitled to receive a CDIB card on application. The burden of proving Indian ancestry rests upon the applicant.

### III. PROCEDURAL BACKGROUND

#### A. The Case At Bar

On January 16, 1996, plaintiffs filed the instant action. Plaintiffs and defendants then cross-moved for summary judgment. Defendants additionally moved for dismissal on various procedural grounds, including Federal Rule of Civil Procedure 19. On March 20, 1998, the Court granted defendants' motion to dismiss, holding the Seminole Nation was an indispensable party that cannot be joined on account of sovereign immunity.[10]

---

9. The Seminole Nation of Oklahoma does not require a specific blood quantum. It stands to reason that a fully recognized member of the Seminole Nation, by the Seminole Nation, may *never* be eligible to receive a CDIB card and therefore automatically excluded from participating in tribal benefits that require a CDIB card. This is true despite the Black

Seminoles' right to participate in the tribal decision making process by voting on tribal matters.

10. This holding applied to both plaintiffs' Judgment Fund Award claim and plaintiffs' CDIB claim.

Plaintiffs appealed this ruling to the Tenth Circuit Court of Appeals. On September 21, 1999, the Tenth Circuit reversed this Court's order dismissing plaintiffs' CDIB claim. The Tenth Circuit further reversed this Court's order dismissing plaintiffs' Judgment Fund Award claim and remanded the matter to this Court "to conduct an analysis of all the factors articulated in Rule 19(b) and make a reviewable determination as to whether the Tribe is an indispensable party with respect to Plaintiffs' Judgment Fund Award claim." *Davis v. United States*, 192 F.3d 951, 961 (10th Cir.1999).[11]

On January 4, 2000, this Court ordered the parties to submit simultaneous briefing on the issue of whether the Seminole Nation is an indispensable party. On February 15, 2000, the parties submitted those briefs. Additionally, defendants have again moved for dismissal on various procedural grounds.

### B. *Administrative Proceedings*

On September 22, 1995, counsel for plaintiffs wrote to James Fields, Superintendent of the Wewoka Agency, BIA, alleging that Freedmen Band members were being denied CDIB cards in violation of BIA policy. On October 4, 1995, Mr. Fields responded, stating:

[t]he Certificate of Degree of Indian Blood makes or infers no mention of Tribal Membership. The [BIA's] policy states that my responsibility is to certify [someone's] Indian blood when acceptable proof of relationship to an individual enrolled on specific rolls of particular tribes or to a person who has received a valid Certificate of Degree of Indian Blood. For the Seminole Nation, this is the index and final rolls of citizens and Freedmen approved by Act of Congress on June 21, 1906.

The final rolls of the Freedmen were mentioned [in the BIA policy statement] because there are persons listed on the Freedmen rolls who were part Indian. As you know, the Seminole Nation follows maternal lineage, for example, if the person's mother was a [F]reedman and the father was Indian by blood, the person was enrolled in the [F]reedmen roll. This person was still part Indian and he/she and his/her descendants would be eligible to receive a Certificate of Degree of Indian Blood. In fact, this has happened and is happening: Certificates of Degree of Indian Blood were issued and they have received benefits from judgment fund programs.

Defs.' Post Remand Mot. Dismiss, Exhibit 14, ¶¶ 2–3.

On October 6, 1995, counsel for plaintiffs filed a Notice of Appeal of the Superintendent's decision to the Area Director. By letter dated September 11, 1996, the decision was affirmed. The September 11, 1996 decision states, in pertinent part:

the Superintendent's decision essentially answers the academic question of whether CDIB cards will be issued to applicants who have not presented proof of Indian Blood.

A CDIB card is a certification by a BIA Agency Superintendent or a Field Representative that an individual possesses a specific quantum of Indian blood. When determining whether an individual CDIB applicant is entitled to receive a CDIB [card], the BIA does not rely upon whether the applicant is a member of an Indian tribe. There are persons of Indian blood who are not enrolled members of an Indian tribe. The burden of

---

**11.** In its Order, the Tenth Circuit held this Court did not abuse its discretion when it held the Seminole Nation was a necessary party whose joinder is not feasible. *Davis*, 192 F.3d at 959.

.proof regarding the issuance of a CDIB [card] rests upon the individual applicant to establish lineage from Indian ancestors. When anyone, including a Freedmen Band member, applies for a CDIB card without providing acceptable documentation of descendency [from] a Seminole Indian by blood, that applicant will not be issued a CDIB card.

\* \* \* \* \* \*

The BIA has issued, and will continue to issue, CDIB cards to members of the Freedmen [B]ands and others who have provided evidence of descendency from a member shown on the Dawes Commission enrollment cards as possessing Seminole blood.

Defs.' Post Remand Mot. Dismiss, Exhibit 15 at 2,3.

On October 15, 1996, plaintiffs appealed this decision to the Interior Board of Indian Appeals in Arlington, Virginia ("Board"), where the appeal was pending at the time the Court issued its original order dismissing this case. While this case was pending with the Tenth Circuit, the Board determined that inasmuch as CDIB cards are issued only to persons, not to tribes or subsections of a tribe, the Bands were not proper appellants. The Board then directed plaintiffs' counsel to provide names of individual Band members who had actually applied for CDIB's from the Wewoka Agency, BIA. On February 3, 1998, the Board dismissed the administrative case for lack of jurisdiction.

## IV. DISCUSSION

### A. Judgment Fund Award Claim

#### 1. Rule 19(b) Analysis

██ If an absent party is necessary but cannot be joined, the Court must then determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed.R.Civ.P. 19(b). "A necessary party can be considered an indispensable party only if, in equity and good conscience, a court should not allow the action to proceed in the party's absence." *Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1259 (10th Cir.2001). If the Court concludes the action cannot proceed "in equity and good conscience," it must dismiss the suit.

██ Determining whether in equity and good conscience a suit can proceed in the absence of a necessary party requires a court to consider four factors:

[F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b). "Rule 19(b) analysis requires that the factors be evaluated in a practical and equitable manner, and be given the appropriate weight." *Rishell v. Jane Phillips Episcopal Memorial Medical Center*, 94 F.3d 1407, 1412 (10th Cir. 1996). "These four factors are not rigid, technical tests, but rather guides to the overarching equity and good conscience determination." *Wichita and Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 774 (D.C.Cir.1986) (internal quotations and citations omitted). "This Rule 19(b) language leaves the district judge with substantial discretion in considering which factors to weigh and how heavily to emphasize certain considerations in deciding whether the action should go forward in the absence of someone needed for a com-

plete adjudication of the dispute." *Cloverleaf Standardbred Owners Ass'n, Inc. v. National Bank of Washington,* 699 F.2d 1274, 1277 (D.C.Cir.1983) (internal quotations and citations omitted).

The party moving for dismissal based on failure to join an indispensable party bears the burden of persuasion. *Rishell,* 94 F.3d at 1411. "An indispensable party is one who has such an interest in the subject matter of the controversy that a final decree cannot be rendered between the other parties to the suit without affecting his interest, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience." *Turner v. Brookshear,* 271 F.2d 761, 764 (10th Cir.1959). In determining whether parties not named are indispensable parties, the courts must balance the interests of plaintiffs against those of defendants and absentees. *See Francis Oil and Gas, Inc. v. Exxon Corp.,* 661 F.2d 873 (10th Cir.1981). Although there is a strong public policy that has favored dismissal when a court cannot join an Indian tribe because of sovereign immunity, "a court does not know whether a particular [party] is indispensable until it ha[s] examined the situation to determine whether it can proceed without it." *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 119, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

a. *To what extent a judgment rendered in the Seminole Nation's absence might be prejudicial to the Seminole Nation or those already parties*

The disposition of plaintiffs' Judgment Fund Award claim without the presence of the Seminole Tribe as a party to the lawsuit will be prejudicial to the Seminole Tribe. "Conflicting claims by beneficiaries to a common trust present a textbook example of a case where one party may be severely prejudiced by a decision in his absence." *Wichita and Affiliated Tribes of Oklahoma,* 788 F.2d at 774. Plaintiffs assert the Eligibility Requirement for participation in the Judgment Fund Award is discriminatory and defendants condone this alleged discrimination each time they disperse monies from the Judgment Fund Award to the Tribe. However, it was the Tribe, through its ordinances, that *ultimately* ratified the proposal excluding the Black Seminoles from benefitting from the Judgment Fund Award. The BIA is not representing the Seminole Nation's interest in this lawsuit, and therefore, the Seminole Nation has no party to represent its interest in its programs and the distribution of its funds for those programs. As the Tenth Circuit stated:

> The record demonstrates, however, that the Tribe has developed, enacted, and sought approval of programs that are or will be financed by the Judgment Fund Award. The Tribe has determined the eligibility criteria for participation in such programs and has adopted ordinances containing the Eligibility Requirement. The Estelusti Seminoles are effectively prohibited from participating in Judgment Fund Programs because of the Eligibility Requirement. A ruling on the merits in favor of Plaintiffs on their Judgment Fund Award claim will have the practical effect of modifying the Tribal ordinances containing the Eligibility Requirement. Unless the Tribe is a party to the lawsuit, it has no ability to protect its claimed interest in determining eligibility requirements.

*Davis,* 192 F.3d at 959.

Plaintiffs request the Court issue an injunction compelling defendants to require that the Seminole Nation provide benefits deriving from the Judgment Fund Award to the Black Seminoles. A favorable judgment for plaintiffs on their judgment fund award claim would, in effect, reverse the decisions of the Tribe's governing body,

and significantly interfere with the Tribe's ability to govern its programs. Essentially, the Court would be defining who is eligible for participating in tribal programs. Accordingly, the Court finds such a judgment would be highly prejudicial to the absent Seminole Nation.

b. *The extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided*

Prejudice to the Tribe cannot be avoided. Plaintiffs seek a remedy that the Court finds, if granted, will have a prejudicial effect on the Tribe. The Court finds there is no way to shape relief that would lessen or avoid the prejudice to the absent Tribe. Plaintiffs' complaint hinges on the Eligibility Requirement established by the Tribe. No matter how the remedy is shaped, essentially the Court will be modifying the Tribe's policies and ordinances. Further, the Court finds there are no protective provisions which could be included in the judgment which would prevent trampling on the Seminole Nation's sovereign right to make its own laws and be ruled by them. Although the Seminole Nation cannot be joined, plaintiffs' lawsuit is in effect an attack on its tribal ordinances. The Court cannot envision the construction of a remedy which would lessen or avoid the prejudice against the absent Tribe.

The Court also finds compelling the very real possibility that defendants would incur a substantial risk of inconsistent legal obligations if the BIA officials were subsequently sued by the Seminole Nation for actions taken in violation of tribal law as a result of plaintiffs' success in this cause of action. Plaintiffs seek an injunction compelling the BIA to ensure that the payments it makes to the Seminole Nation are spent "lawfully," which according to plaintiffs means being spent for benefits which

are provided to the Black Seminoles on the same basis as to other Seminoles. If the Court granted the requested injunction against the BIA, such an injunction would require the BIA to take some action against the Seminole Nation's administration of its Judgment Fund Programs.

c. *Whether a judgment rendered in the Seminole Nation's absence will be adequate*

A judgment in favor of plaintiffs will not settle this cause of action. Plaintiffs' success in this lawsuit would not necessarily afford complete relief because a favorable decision by this Court will not have a binding effect on the absent Tribe. A judgment against defendants is not binding on the Seminole Nation, and undoubtedly would have no influence on the manner in which the Tribe runs its tribal programs. Without a binding effect, the Tribe would certainly continue to assert its authority, management responsibilities and control of the Judgment Fund Programs via its tribal ordinances. The Court finds without the participation of the absent Seminole Nation, no practical effect will ensue from a favorable plaintiffs' decision.

d. *Whether plaintiffs will have an adequate remedy if the action is dismissed for nonjoinder*

Although the first three factors weigh in favor of dismissal and against the Court proceeding "in equity and good conscience," the fourth factor weighs heavily in plaintiffs' favor. Defendants assert plaintiffs can challenge the Eligibility Requirement through the Seminole Nation's own legislative and political mechanism. The Court, however, finds that this proposed avenue of relief is inadequate to address plaintiffs' claim. The Court finds plaintiffs have no alternative forum in

which their claim can be heard. Requiring plaintiffs to maneuver their claim through the Seminole Nation's legislative bodies would, in effect, be futile. Conceivably, this tribal legislative body to which defendants refer is one and the same with the tribal legislative body responsible for determining eligibility for participation in and administering the Judgment Fund Award programs.

Critical to Rule 19(b) analysis is the availability or unavailability of an alternative forum. The Court finds compelling "plaintiff[s'] interest in having the federal forum," and finds strongly influential the unavailability of an alternative forum. *Pasco Intern. (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 500 (7th Cir.1980). "The absence of an alternative forum [ ] weigh[s] heavily, if not conclusively against dismissal." *Rishell*, 94 F.3d at 1413. However, despite this reasoning and the Court's belief that plaintiffs should not be prevented from having their case tried on the merits which would essentially occur if the Court determines the case cannot proceed in the absence of the Seminole Nation, the Court finds this is the *only* factor weighing in plaintiffs' favor.

■ Having weighed the relevant factors, the Court finds that in equity and good conscience plaintiffs' Judgment Fund Award claim should not proceed among the parties before it. While the Court finds plaintiffs' forum argument persuasive, the Court finds the prejudice to the absent Tribe, the Court's inability to lessen the prejudice and the absence of an adequate remedy without the Tribe's joinder prevent proceeding in equity and good conscience. Accordingly, the Court concludes the Seminole Nation is an indispensable party to plaintiffs' Judgment Fund Award claim and that the Judgment Fund Award claim should be dismissed for nonjoinder. The Court would note, however, that its conclusion that the Judgment

Fund Award claim may not proceed does not reflect any findings by the Court as to the merits of plaintiffs' Judgment Fund Award claim.

Accordingly, the Court GRANTS defendants' motion for summary judgment as to the Judgment Fund Award claim.

**B.** *Certificate of Degree of Indian Blood*

■ A person or persons adversely affected or aggrieved by agency action, including a failure to act, is entitled to judicial review thereof provided the agency action is final and for which there is no other remedy. *See 5 U.S.C. § 702–704.* An action is not ripe for review where no final adverse action has been taken. "The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law." *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). "The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction." *Id.* at 194, 89 S.Ct. 1657. "It is obvious that administrative remedies must be exhausted under virtually all instances where judicial review is sought." *Harr v. Federal Home Loan Bank Board,* 557 F.2d 747, 749 (10th Cir.1977).

"Officials and agencies in their administrative chain should have an opportunity to consider the issues and claims and to so exercise their discretion before the matter is submitted to the courts." *Id.* The expertise of the administrative agency assists with developing an adequate record for judicial review. Exhaustion of administrative remedies is especially pertinent where factual issues calling for special agency expertise is present. *See Public Citizen v. Goyan,* 496 F.Supp. 364, 365 (D.D.C.1980). Further, it is the interested parties' re-

sponsibility to determine the proper procedure established by the agency.

■■■■ An agency has the authority to prescribe by regulation the procedures to be followed in order to exhaust one's administrative remedies. "[An] agency may by rule require that all appellate steps be taken within the agency and that all remedies be exhausted before the applicant may seek a review in the court." *United States v. Consolidated Mines & Smelting Co.*, 455 F.2d 432, 452 (9th Cir.1971). The BIA has established regulations which provide administrative appeal procedures for decisions of BIA officials by persons who are adversely affected by those decisions, or allege that they are legally administratively incorrect. *See* 25 CFR § 2 (1989). The regulations provide that no decision which at the time of its rendition is subject to appeal to a superior authority within the BIA shall be considered final so as to be agency action subject to review under 5 U.S.C. § 704. *See* 25 CFR § 2.6(a). Hence, exhaustion of the appeal procedures is a jurisdictional prerequisite to judicial review.

Where a plaintiff alleges the BIA has not responded or acted upon a request to the official, there are administrative procedures which govern the ability of a plaintiff to seek judicial review of that official's alleged inaction. The BIA provides administrative appeal procedures for the inaction of BIA officials. 25 CFR § 2.8(a) provides in pertinent part:

(a) A person or persons whose interests are adversely affected, or whose ability to protect such interests is impeded by the failure of an official to act on a request to the official, can make the official's inaction the subject of appeal, as follows:

(1) Request in writing that the official take the action originally asked of him/her;

(2) Describe the interest adversely affected by the official's inaction, including a description of the loss, impairment or impediment of such interest caused by the official's inaction;

(3) State that, unless the official involved either takes action on the merits of the written request within 10 days of receipt of such request by the official or establishes a date by which action will be taken, an appeal shall be filed in accordance with this part.

Therefore, even in the absence of requested action of a BIA official, BIA regulations still require a plaintiff to exhaust its specified administrative procedures before requesting judicial review.

Defendants assert plaintiffs have not established this Court's jurisdiction for review because they have not exhausted their administrative remedies. Defendants assert there is no agency record or final agency action for the Court to review. Defendants further assert the historically unique and complex Indian blood degree issues in the case at bar should first be addressed by the BIA. Specifically, defendants assert two reasons plaintiffs have failed to exhaust their administrative remedies. First, there is no documentary evidence or record that the individual plaintiffs have ever applied for a CDIB card from the BIA. Second, because CDIB cards are issued to individual Indians, not political subsections of a tribe, as to the "Band plaintiffs," there is also no administrative decision for this Court to review under the Administrative Procedures Act ("APA").

Plaintiffs assert this Court has jurisdiction pursuant to the APA, 5 U.S.C. §§ 702–703. Plaintiffs assert the BIA routinely and discriminatorily refuses to accept applications for or issue CDIB cards to members of the Estelusti Bands. Plaintiffs further assert several members of the

plaintiff Bands have previously applied for CDIB cards, but either the BIA refused to grant the CDIB cards or failed to respond to their applications. Alternatively, plaintiffs assert they are not required to exhaust any administrative remedies or to demonstrate final agency action for four reasons. First, the pursuit of such remedies would be futile. Second, their constitutional rights are being violated. Third, the issues to be decided are purely legal issues. Finally, irreparable harm would ensue if plaintiffs' claim was dismissed.

 Having carefully reviewed the parties' briefs and the applicable statutes, the Court finds plaintiffs have not demonstrated the Court has jurisdiction over their CDIB claim pursuant to the APA. The Court finds plaintiffs have not complied with the established administrative procedures which would render their CDIB card claim ripe for appeal. Although plaintiffs allege they completed and submitted applications for CDIB cards and the BIA failed to act, there remain administrative procedures that must be followed. Plaintiffs have not demonstrated they have complied with the provisions established for appealing inaction of an official. The record is void of any evidence that plaintiffs ever requested in writing that the BIA take action on their CDIB card applications. Plaintiffs merely assert the applications were completed, but they "received no response from the BIA." Pls.' Mem. Opp'n Mot. Dismiss, or Alt. Summ. J. at 8.

Further, the Court is not persuaded that plaintiffs should be relieved of the exhaustion requirements established by the BIA. The Court finds the governmental interests in requiring exhaustion are strong in the case at bar. Because of the technical nature of the issuance of CDIB cards, the Court finds it would be beneficial first to have the BIA exercise its special expertise in the matter. Further, the interest of the BIA in administrative autonomy also supports requiring exhaustion of administrative remedies.

Accordingly, the Court GRANTS without prejudice defendants' motion to dismiss CDIB card claim.

## CONCLUSION

Although the Black Seminoles may seek to have their Judgment Fund Award claim heard on the merits through the Tribe's legislative or judicial bodies, the Court recognizes the reality of these options. The Court finds it will be futile for the Black Seminoles to seek adjudication in these tribal forums. The Court's disposition as to the Black Seminoles' Judgment Fund Award claim effectively terminates the Black Seminoles' opportunity to have their Judgment Fund Claim heard by an impartial adjudicative body; however the Court is duty bound and shall follow the law in deciding the issues before it.

For the reasons set forth above, the Court grants the following as to defendants' "Post–Remand Motion to Dismiss or, in the Alternative, for Summary Judgment," [docket no. 73]:

(1) The Court GRANTS defendants' motion for summary judgment as to plaintiffs' Judgment Fund Award claim; and

(2) The Court GRANTS defendants' motion to dismiss without prejudice as to plaintiffs' CDIB Card claim.