WALLER, Chief Justice,
for the Court:
¶ 1. Clayton Gutierrez appeals from the divorce judgment of the Chancery Court of Harrison County, Second District, in which the chancellor granted Clayton’s wife Trisha lump-sum and periodic alimony incident to the divorce and found Clayton in contempt for failing to make court-ordered support payments to Trisha. Finding a lack of record support in the allocation of marital liabilities, we reverse the chancery court’s judgment and remand for further proceedings.
FACTS & PROCEDURAL HISTORY
¶ 2. Clayton and Trisha married on December 12, 1987. At the time, Clayton worked for his family’s seafood business, and Trisha was a student teacher. They had three children during their marriage. The parties separated in December 2009 but remained living together in the marital home. At the time of the separation, Trisha did not have a job outside the home. Clayton was still working for his family’s business, but he also worked in real estate and construction. Following the separation, Trisha enrolled at William Carey College and became recertified to teach, eventually obtaining a job as a first-grade teacher at D’Iberville Elementary School.
¶ 3. Trisha filed for divorce in March of 2010, and Clayton filed a counterclaim for divorce in response. Although the parties initially asserted various fault grounds for divorce, eventually they agreed to proceed on the ground of irreconcilable differences. In their Voluntary Consent to Divorce, the parties reached an agreement for the custody and visitation of the children. The parties’ remaining contested issues dealt primarily with the equitable distribution of marital assets and liabilities.
¶4. Several temporary hearings were held prior to the final trial on the merits. In a May 4, 2010, temporary order, the chancery court ordered Clayton to “continue to pay the necessities of the marriage, including but not limited to utilities, mortgages, cellular telephones, automobile notes, automobile insurance, health insurance, gas and groceries of the wife.” Subsequent to the entry of this order, Trisha filed several motions for citation of contempt against Clayton, claiming that he had failed to pay for necessary family expenses. The chancery court ruled on Trisha’s first motion, finding Clayton in contempt for failing to pay $7,656.27 in necessary expenses. However, the chancellor reserved ruling on all other subsequent contempt issues until the trial on the merits.
¶ 5. A trial on the contested issues was held in April 2012. The majority of the evidence presented at trial focused on the value of Clayton’s interests in various business ventures, including his family’s seafood business, Global Seafood Technologies, Inc. Evidence regarding the parties’ net worth was highly conflicting. The chancellor noted that Clayton had represented his family’s net worth to be as high as $13,000,000 in financial statements given to banks two years prior to the filing of the divorce, but that this figure had shrunk to $1,400,000 a few weeks after Trisha filed her divorce complaint. By the time of trial, Clayton represented his net worth to be zero. Annette Herrin, a court-appointed business valuation expert, and James C. Stokes, Clayton’s accountant, each offered their respective opinions regarding the value of Clayton’s various business interests. Herrin placed a value on Clayton’s equity interests in his various business ventures at $618,500. Stokes claimed that Clayton’s net worth was approximately -$70,000, but could drop as low as -$800,000 due to other potential liabilities.
¶ 6. In its divorce judgment, the chancery court granted the parties a divorce on *707 the grounds of irreconcilable differences and adopted the parties’ child-custody and visitation agreements.[1] Then, the chancellor reviewed the Ferguson[2] factors for the equitable distribution of marital property and divided the parties’ marital estate into four categories: (1) assets available to be distributed, (2) assets already distributed or sold, (3) assets foreclosed on and sold, and (4) Clayton’s business interests. The chancellor determined that the net marital estate, which consisted primarily of Clayton’s business interests, was valued at $501,647, allocating $35,685 to Trisha and $465,962 to Clayton. Trisha’s share of the net marital estate consisted of her vehicle, her checking and retirement account, the couple’s interest in several parcels of real estate, and proceeds from other marital assets that had been sold during the divorce. The chancellor balanced the apportionment of assets by granting Trisha lump-sum alimony of $215,139.50, to be paid in five annual installments. In addition, after considering the Armstrong[3] factors, the chancellor awarded Trisha $2,000 per month in permanent alimony.
¶7. With respect to Trisha’s previous contempt motions, the chancellor found Clayton in contempt for failing to pay $16,019 in family expenses as required by previous temporary orders, entered judgment in that amount in Trisha’s favor, and awarded Trisha $2,500 in attorney’s fees.
¶ 8. Clayton now appeals from the chancery court’s judgment, raising the following issues:
I.Whether the chancery court erred in its calculation of marital assets and liabilities.
II. Whether the chancery court erred in its valuation of Clayton’s interest in Global Seafood Technologies, Inc.
III. Whether the chancery court erred in awarding Trisha lump-sum and periodic alimony.
IV. Whether the chancery court erred in finding Clayton in contempt of court and awarding Trisha a judgment and attorney’s fees for the same.

STANDARD OF REVIEW

¶ 9. A chancellor’s findings will not be disturbed upon review unless the chancellor was manifestly wrong, clearly erroneous, or applied an incorrect legal standard. A.B. v. Y.Z., 60 So.3d 737, 739 (Miss.2011). Where there is a question of law, the appellate court applies a de novo standard of review. Estate of Davis v. O’Neill, 42 So.3d 520, 524 (Miss.2010). “Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record.” Henderson v. Henderson, 757 So.2d 285, 289 (Miss.2000) (citing Hammett v. Woods, 602 So.2d 825, 827 (Miss.1992)).

DISCUSSION

I. Whether the chancery court erred in its calculation of marital assets and liabilities^
¶ 10. Clayton claims that the chancery court made several serious errors in its *708 calculation of marital assets and liabilities which, taken together or individually, skewed the court’s equitable distribution and require reversal. Specifically, Clayton attacks the chancery court’s division of the second mortgage on the marital home and valuation of his interest in his family’s seafood business and other business ventures. Clayton’s argument regarding the valuation of his family’s seafood business will be discussed later in Section II of this opinion. We discuss each of Clayton’s other assignments of error separately.
A. Whether the chancellor incorrectly divided the second mortgage on the marital home as a liability to both parties.
¶ 11. The parties’ marital home was subject to two mortgages at the time of the separation. Prior to trial, the bank holding the first mortgage foreclosed on the house, and it was sold for $828,000. This amount covered all of the first mortgage and left a balance of $341,686 on the second mortgage. In determining how the marital estate should be distributed, the chancellor assessed the balance of the second mortgage equally as a $170,818 liability to both Clayton and Trisha. Clayton argues that the chancery court should have assigned the entire second mortgage as a liability to him. Increasing the allocation of debt Clayton is required to pay on the second mortgage would decrease the assets to be awarded to Trisha. Clayton claims that the trial court’s error in allocating the second mortgage calls into question its large award of lump-sum alimony to Trisha.
¶ 12. During trial and at other hearings before the chancery court, Clayton testified that, although both he and Trisha had signed the deed of trust on the second mortgage, Trisha had not signed the promissory note. Therefore, according to Clayton, Trisha would not be responsible for repaying any of the outstanding balance on the second mortgage. The chancellor recognized this fact in the judgment of divorce, noting that responsibility for the second mortgage was Clayton’s alone. The chancellor also listed the second mortgage as one of Clayton’s debts during his discussion of the Armstrong factors for awarding alimony.
¶ 13. The record does not contain evidence that demand has ever been made for the deficiency on the second mortgage, which is required under Mississippi law before a mortgagee can collect a post-foreclosure deficiency. See Lake Hillsdale Estates, Inc. v. Galloway, 473 So.2d 461, 466 (Miss.1985) (“[A] mortgagee’s right to a deficiency decree is not absolute.”); Miss. Valley Title Ins. Co. v. Horne Constr. Co., Inc., 372 So.2d 1270, 1272 (Miss.1979) (“[Sjince the mortgaged premises constitute the primary fund for the payment of the mortgage debt, it is only where the mortgagee has endeavored to collect it out of the land that a just judgment for deficiency can be entered.”). Assuming that the holder of the second mortgage intends to collect on the remaining balance, neither party has cited any authority addressing whether Trisha can be held legally responsible for paying the deficiency if Clayton cannot pay. Also, while the chancellor noted that Clayton might not have to pay back the deficiency, he never expressly addressed the parties’ respective obligations in the event the second mortgagee did obtain a deficiency judgment.
¶ 14. After reviewing the evidence presented at trial and the chancellor’s divorce judgment, this Court cannot determine the chancellor’s rationale with respect to the allocation of the parties’ second mortgage. It appears from the record that Trisha did not sign the note that was secured by the second mortgage, and was not legally re *709 sponsible for it. Nevertheless, the chancellor ordered her to pay half of that obligation. This Court is unable to ascertain whether the chancellor mistakenly ordered her to pay half the note, or instead ordered her to pay half the note as a part of the chancellor’s equitable distribution of all the marital assets and liabilities. We therefore reverse the chancellor’s equitable distribution of the parties’ assets and liabilities and remand this case for a more definite explanation and finding regarding the second mortgage debt, if any.
B. Whether the chancellor erred in valuing Clayton’s interest in several business ventures at zero, rather than negative figures.
¶ 15. Clayton argues that Annette Herrin, a court-appointed business valuation expert, incorrectly assigned values of zero to his ownership interests in two business entities, Biloxi Realty Group, LLC, and G & G Trading Company, Inc., where his interests in those entities should have been given negative values. Thus, Clayton argues that the chancellor erred in relying on Herrin’s findings in calculating the value of Clayton’s share of the marital estate.
¶ 16. Clayton owns a twenty-five percent interest in both Biloxi Realty and G & G. Using the net-asset valuation method, and excluding any type of personal or professional goodwill, Herrin determined that the liabilities of each of these entities exceeded the value of their assets. Herrin also noted that some of the entities’ liabilities consisted of loans owed either to each other or to other businesses in which Clayton had an ownership interest. Ultimately, Herrin valued Clayton’s interests in Biloxi Realty and G & G at -$242,966 and - $5,416, respectively. However, at the end of her valuation reports, Herrin listed the values of Clayton’s interests in Biloxi Realty and G & G as “NONE.”
¶ 17. In response to Herrin’s report and testimony, Clayton called his accountant, James C. Stokes, to testify regarding the value of Clayton’s business interests. Stokes testified that he agreed with Her-rin’s report and understood how she reached her results, but he disagreed with the fact that she had ignored Clayton’s negative equity in Biloxi Realty and G & G. In Stokes’s opinion, the excess liabilities owed by Biloxi Realty and G & G either should have been recognized as negative figures, or they should have been written off and shown as income. Stokes also alleged that Clayton was personally liable for the debts of Biloxi Realty and G & G. Based on the values included in Herrin’s report and Clayton’s financial disclosures to the Court, Stokes opined that Clayton had a net worth of -$70,000. However, Stokes stated that Clayton’s net worth could be as low as -$800,000 if his interests in Biloxi Realty and G & G were given negative value rather than zero value and if Clayton was called on personally to repay the entities’ debts.
¶ 18. We find that the chancellor did not err in accepting Herrin’s valuation of Clayton’s business interests over the valuations by Clayton and Stokes. “[A] chancellor is justified in rejecting the values an appraiser places on assets where there is reason to doubt the trustworthiness of the appraisal.” A & L, Inc. v. Grantham, 747 So.2d 832, 842 (Miss.1999) (citing Carrow v. Carrow, 642 So.2d 901, 907 (Miss.1994)). In its judgment of divorce, the chancery court recognized the discrepancies between Clayton’s financial disclosures to the court and the other evidence presented at trial, noting that “[t]he court was troubled, more than once, by [Claytonj’s testimony and his lack of truthfulness regarding the assets of the marital estate and his earnings.” In addition, when addressing the need for alimony in *710 this ease, the chancellor stated, “The ability of this court to determine [Clayton]’s earning capacity is difficult. His lack of truthfulness was evident throughout. His exaggerated lifestyle, i.e., hunting, traveling, extravagant home, were not consistent with lack of earnings.” The chancellor found that Clayton had presented no documentation to support his claim that he was personally liable for the debts of Biloxi Realty or G & G. The chancellor rejected Stokes’s valuations because they were based on mere speculation regarding potential liabilities. Accordingly, the chancellor held that Clayton had failed to show that Herrin’s valuation of his business interests was incorrect. We find that the chancellor’s ruling was not manifestly incorrect and was supported by substantial credible evidence.
II. Whether the chancellor erred in its valuation of Clayton’s interest in Global Seafood Technologies, Inc.
¶19. Clayton owns a 13.5646% interest in Global Seafood. Global Seafood is a publicly traded corporation, but its stock is currently delisted. Herrin did not use the price of Global Seafood’s stock to determine the value of Clayton’s interest in the company. In fact, Clayton did not present any evidence at trial regarding the price of Global Seafood’s stock. Instead, Herrin determined the net value of the corporation’s assets and then calculated Clayton’s interest as a percentage of that value, taking into account a lack-of-control discount. Using this method, Herrin determined that Clayton’s interest in Global Seafood was worth $379,900. Clayton did not present any evidence contradicting Herrin’s valuation, and the chancellor relied on Herrin’s valuation in determining the equitable distribution of marital assets.
¶ 20. On appeal, Clayton concedes that Mississippi law requires an asset-based approach to business valuations in divorce cases, as goodwill is not an asset that can be divided between the spouses. See generally Yelverton v. Yelverton, 961 So.2d 19, 29 (Miss.2007). Nevertheless, Clayton maintains that Herrin incorrectly valued his interest in Global Seafood because he owns only stock and has no control over the sale of the company’s assets.
¶21. Clayton argues that the chancery court impermissibly pierced the corporate veil by valuing his ownership interest as a percentage of the value of the company’s assets. It is true that the chancery court generally cannot divide assets belonging to a corporation through equitable distribution in a divorce. See Skinner v. Skinner, 509 So.2d 867, 870 (Miss.1987) (finding that the chancellor erred in awarding former wife a vehicle belonging to a corporation which was owned solely by the former husband). However, the chancellor did not award Trisha any of Global Seafood’s assets; Clayton was awarded his full interest in the corporation. The chancellor merely adopted the only valuation of Global Seafood that was presented at trial. And while Global Seafood technically is a publicly traded corporation, the evidence produced at trial revealed that Clayton’s interest in the company extended beyond mere stock ownership. Herrin testified that Global Seafood’s financial statements included substantial unsecured loans to Clayton which had never been repaid. Nevertheless, Herrin determined the fair-market value of Clayton’s interest using the willing-buyer, willing-seller model as required by this Court, see Ferguson, 639 So.2d at 929, taking into account the fact that a willing buyer would not enjoy the same control over the company as Clayton. We find that the chancellor’s valúa *711 tion of Clayton’s interest in Global Seafood was not manifestly incorrect and was supported by substantial credible evidence.,
III. Whether the chancery court erred in awarding Trisha lump-sum and periodic alimony.
¶22. “If there are sufficient marital assets which, when equitably divided and considered with each spouse’s non-marital assets, will adequately provide for both parties, no more need be done.” Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994). However, where the equitable division of property creates a deficit for one of the spouses, “alimony based on the value of nonmarital assets should be considered.” Id. An award of alimony can be determined only after the chancellor has equitably divided the marital estate and determined that one spouse has suffered a deficit. Lauro v. Lauro, 847 So.2d 843, 848 (Miss.2003).
¶ 23. In this case, the chancellor determined that the parties’ marital estate was worth $501,658; thus, an equal share of the estate would be worth $250,829. However, the bulk of the marital estate’s value was attributable to Clayton’s business interests, and Clayton retained these business interests when the marital estate was divided. Thus, the equitable portion of the marital estate awarded to Trisha was valued at only $35,685. The chancellor awarded Trisha lump-sum alimony in the amount of $215,139.50 to account for the deficit between the value of her equitable share of the estate and the value of an equal share. He also awarded Trisha periodic alimony of $2,000 per month. However, Trisha’s relatively small estate value is largely attributable to the $170,818 liability assigned to her, representing half of the balance of the second mortgage on the marital home, which she or Clayton may never have to pay.
¶ 24. This case is being remanded for the chancery court to determine whether Trisha or Clayton has any legal responsibility to repay the second mortgage and to reallocate the mortgage liability accordingly. Where it is necessary to reverse the chancery court’s division of the marital estate, an accompanying award of alimony should also be reversed, as a reallocation of marital assets and liabilities may obviate the need for alimony. See Lauro, 847 So.2d at 850; Henderson v. Henderson, 703 So.2d 262, 266 (Miss.1997). Accordingly, on remand, the chancellor should revisit his award of alimony to Trisha after determining what, if anything, is owed on the second-mortgage deficiency, and who, if anyone, is responsible for repaying it.
IV. Whether the chancery court erred in finding Clayton in contempt of court and awarding Trisha a judgment and attorney’s fees for the same.
¶ 25. At an April 28, 2010, temporary hearing, the chancellor enjoined the parties from making any unnecessary expenditures. This injunction was memorialized in a temporary order on the following day. In an additional temporary order on May 4, 2010, the chancellor ordered Clayton to “continue to pay the necessities of the marriage, including but not limited to utilities, mortgages, cellular telephones, automobile notes, automobile insurance, health insurance, gas and groceries of the wife.” Clayton also was ordered to pay Trisha $750 per month for “other expenditures.” Both parties were ordered to provide copies of their receipts and credit-card statements to each other at the end of each month.
¶ 26. On January 26, 2011, Trisha filed a motion requesting the chancery court to find Clayton in contempt for, among other *712 things, failing to make support payments as required by the court’s previous temporary orders. The court held a hearing on the motion on February 16, 2011. At the conclusion of the hearing, the chancellor found Clayton in contempt for failure to make the required support payments and entered a judgment of $7,656.27 in Trisha’s favor. An order to this effect was entered on March 23, 2011. The order stated that Clayton would be given credit for any amounts included in the contempt judgment that were found to be “not for family necessities as provided in the Court’s prior orders.” The court reserved the issue of attorney’s fees until trial.
¶ 27. On May 3, 2011, Trisha filed another motion requesting the trial court to find Clayton in contempt for failing to make support payments of approximately $7,000 after the court’s previous contempt order. In a July 8, 2011, temporary order addressing the issue, the chancery court directed the chancery clerk to release $7,656.27 from the court registry[4] to Trisha to cover the initial contempt judgment. The chancery court also modified Clayton’s support payment, ordering the chancery clerk to release $2,250 per month from the court registry for the next four months to Trisha to pay for her gas and groceries; the marital home’s water, sewer and cable bills; and the children’s dance classes. The chancellor further ordered that “[a]ll marital debts, including the marital home electricity bill, previously paid by [Clayton] per order of this Court shall continue to be his responsibility until further order of this Court.” The chancellor then concluded, “This does away with the language of the prior Temporary Order wherein [Clayton] was ordered to pay the other marital necessities of the wife.” The chancery court reserved ruling on the pending contempt issues, as well as the issue of whether Trisha’s claimed expenses were “reasonable and necessary family expenses for which she is entitled to reimbursement.”
¶ 28. On March 23, 2012, Trisha filed yet another contempt motion against Clayton, claiming that he now owed more than $16,000 in support payments pursuant to the court’s prior temporary orders. The chancellor addressed the ongoing contempt issue during the trial on the divorce. At trial, Clayton introduced into evidence several spreadsheets documenting Trisha’s claimed monthly expenses. Clayton explained to the court why he believed some of the expenses did not qualify as “necessities of the marriage,” per the court’s previous orders. Clayton also stated that he believed he was not obligated to continue making certain payments after the court’s July 8, 2011, temporary order “[did] away with the language of the prior Temporary Order wherein [Clayton] was ordered to pay the other marital necessities of the wife.” Clayton believed he owed Trisha only approximately $3,000 for necessary expenses, which he claimed he had failed to pay only because he did not have the money.
¶ 29. The chancery court did not rule on Trisha’s final contempt motion until it entered its final judgment of divorce. At the end of the judgment, the chancery court found Clayton in contempt of its May 4, 2010, temporary order requiring him to pay “necessities of the marriage.” The chancery court accepted all of Trisha’s documented expenses without comment and entered judgment against Clayton in the amount of $16,019. The court also *713 awarded Trisha attorney’s fees of $2,500 for Clayton’s contempt.
¶30. On appeal, Clayton argues that the chancery court erred in finding him in contempt and awarding Trisha attorney’s fees because the record does not support a finding that he willfully disobeyed the court’s orders. Specifically, Clayton argues that the chancellor’s May 4, 2010, temporary order and July 8, 2011, temporary order create ambiguity regarding his support obligation, which the chancellor never resolved.
¶ 31. “[C]ontempt matters are committed to the substantial discretion of the trial court[.]” Morreole v. Morreole, 646 So.2d 1264, 1267 (Miss.1994). The chancellor’s findings will not be disturbed unless manifestly wrong. Wing v. Wing, 549 So.2d 944, 947 (Miss.1989). The purpose of civil contempt is to compel parties to obey the orders of the court. Jones v. Hargrove, 516 So.2d 1354, 1357 (Miss.1987). Before a party may be held in contempt for failure to comply with a judgment, “the judgment must be complete within itself ... leaving open no matter or description or designation out of which contention may arise as to its meaning.” Wing, 549 So.2d at 947 (citations omitted). In defending against a civil contempt claim, a party can argue that his or her violation of the court’s order was not willful or deliberate as to be labeled “contumacious.” Dunaway v. Busbin, 498 So.2d 1218, 1222 (Miss.1986). Another defense to civil contempt is the party’s honest inability to perform according to the dictates of the order or decree. Prestwood v. Hambrick, 308 So.2d 82( 85 (Miss.1975). But the defendant has a duty to prove his inability with particularity and not in general terms. Hargrove, 516 So.2d at 1357. Finally, “no charge of contempt will be sustained where the final decree is insufficient to advise the party affected in clear and unequivocal language of that which he has been ordered to do.” Switzer v. Swit-zer, 460 So.2d 843, 846 (Miss.1984).
¶ 32. We find that the chancellor’s contempt judgment and award of attorney’s fees against Clayton was manifestly in error. The chancellor’s May 4, 2010, temporary order required Clayton to pay for all the necessary expenses of the marriage, in addition to paying Trisha $750 per month for “other expenses.” However, the July 8, 2011, temporary order created several obvious ambiguities regarding Clayton’s continuing support obligations. In that order, the chancellor ordered Clayton to continue paying “all remaining marital debts,” but also authorized him to cease paying the mortgages on the marital home, and excused him from paying “the other marital necessities of the wife.” Thus, through the July 8, 2011, temporary order, the chancellor arguably excused Clayton from continuing to pay Trisha’s monthly expenses, or, at the very least, make the $750 monthly “other support” payments. The chancellor acknowledged this ambiguity during a subsequent contempt hearing when he stated, “But this order — the last sentence of paragraph 2, this does away with the language of the prior temporary order where in [sic] [Clayton] was ordered to pay the other marital necessities of the wife.” But the chancellor never resolved this ambiguity in favor of either party, and continued to reserve ruling on the issue until trial, when Trisha had accumulated close to $20,000 of claimed monthly expenses. Trisha included the unpaid $750 monthly payments in her final report of her monthly expenses at trial, but a genuine dispute existed as to whether Clayton was required to make those payments after July 2011. See Wing, 549 So.2d at 947 (reversing chancellor’s contempt judgment against former husband for failing to abide by a provision of a property-settlement agreement, where a genuine dispute existed regarding the interpretation of the provision).
*714 ¶ 33. Clayton admitted that he had failed to reimburse Trisha for some of her valid monthly expenses. Thus, a finding of contempt may be in order. However, the chancery court must resolve the ambiguity. in its previous orders before it can determine the actual amount of Clayton’s deficiency. Accordingly, we reverse the chancery court’s contempt judgment and award of attorney’s fees and remand this case for further proceedings. See Lahmann v. Hallmon, 722 So.2d 614, 623 (Miss.1998) (holding that a an ex-spouse who successfully prosecutes a petition for citation of contempt is eligible for an award of attorney’s fees).

CONCLUSION

¶ 34. This Court affirms the chancellor’s valuation of Clayton’s interests in Global Seafood, Biloxi Realty, and G & G. However,.we find that the chancellor erred in assigning the balance of the parties’ second mortgage as a liability to both parties. Because equitable distribution and alimony must be considered together, we must also reverse the chancellor’s award of alimony to Trisha. Finally, we find that the chancellor erred in finding Clayton in contempt of an ambiguous court order. Accordingly, we reverse the chancellor’s equitable distribution of the marital estate, the award of alimony to Trisha, and the contempt judgment against Clayton, and remand this case to the chancery court for further consideration of these issues.
¶ 35. AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
DICKINSON AND RANDOLPH, P JJ., LAMAR, KITCHENS, CHANDLER, KING AND COLEMAN, JJ., CONCUR. PIERCE, J., NOT PARTICIPATING.

.The chancery court entered its Final Judgment of Divorce on April 17, 2013, and a Corrected Final Judgment of Divorce on April 23, 2013. The Corrected Final Judgment of Divorce will be referred to as "the divorce judgment.”

. Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994).

. Armstrong v. State, 111 So.2d 988 (Miss.1993).

. During the pendency of the litigation, the parties had to sell many assets to enable them to continue paying necessary expenses. The proceeds of these sales were deposited in the court registry and disbursed to pay the parties’ attorneys’ fees, expert-witness fees, and other expenses.