# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CP-01087-COA

**CURTIS HENRY JOHNSON**                                    **APPELLANT**

**v.**

**PAUL BENTON**                                             **APPELLEE**

DATE OF JUDGMENT:              06/12/2019
TRIAL JUDGE:                   HON. JAMES CHRISTOPHER WALKER
COURT FROM WHICH APPEALED:     HOLMES COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        CURTIS HENRY JOHNSON (PRO SE)
ATTORNEYS FOR APPELLEE:        KATHERINE BARRETT RILEY
                               BRANDI RATLIFF HAMILTON
NATURE OF THE CASE:            CIVIL - OTHER
DISPOSITION:                   AFFIRMED - 10/05/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     Paul Benton and certain members of Curtis Johnson's family jointly own a tract of land (the Property) formerly owned by Walter Johnson, Curtis's great-grandfather. Known as the "Johnson Tract," it consists of approximately 286 acres in rural Holmes County, Mississippi. This case stems from a petition for the partition and division of the property filed by Paul and Bobby Benton (the Bentons), who at the time this case commenced owned approximately sixty percent of the Property. The parties entered into an agreed order finalizing the partition and providing, among other matters, that the parties should not enter certain areas of each other's property. The record, however, shows that Curtis had been trespassing on the Bentons' land for several years.

¶2. After entry of the agreed order, Curtis continued to trespass repeatedly on Paul's property. Paul accordingly filed a petition for contempt with the chancery court. In response, Curtis filed a motion to dismiss Paul's petition, claiming for the first time he is subject to tribal sovereign immunity because he is "Chief of the Creek Indians East of the Mississippi." After a hearing, the chancellor denied Curtis's motion to dismiss and granted Paul's petition for contempt. Aggrieved, Curtis appealed.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. This lengthy lawsuit commenced on December 31, 2013, when the Bentons filed a petition for partition of the Property.[1] The rural property, owned by the Bentons and certain members of Curtis's family as tenants in common, is located north of Lexington, Mississippi, along Highway 17. In 1918, Curtis's great-grandfather Walter Johnson purchased the Property. At his death it was devised to his two sons, Reginald and Henry Johnson (Curtis's grandfather). Interest in the Property was subsequently passed down to numerous children, one of whom was Curtis's father, Joe Lewis Johnson. The Bentons own adjacent land and over the years had purchased interest in the Property from several Johnson family members.[2] When the suit commenced, the Bentons owned approximately sixty percent of the Property, and the Johnsons owned about forty percent.

¶4. Defendants responded that they did "not object to a partition in kind but want[ed] to ensure that their interests in natural resources and mineral rights [we]re adequately protected

---

[1] The partition of the Property was never challenged.

[2] The children who had not sold their interest in the Property to Paul Benton were the defendants in the partition action.

in the proposed partition." They requested special commissioners be appointed[3] to inspect and value the Property, and to ascertain the existence of any sand, gravel, or subsurface water on the land. In July 2014, the chancery court appointed four commissioners: an appraiser, a forester, a surveyor, and a geologist.

¶5. The record indicates problems with Curtis began around April 2014, as alleged in the Bentons' August 29, 2014, first amended petition for partition of real property, which included a request for injunctive relief against Defendants for damage to their property and to prevent their reentry. The Bentons own private land adjacent to the land at issue and maintain a hunting camp with expensive equipment on the land. The Bentons' request for injunctive relief was in response to the following alleged incidents: in April 2014, two gates on a road that leads to the Bentons' hunting cabin located on adjacent property were destroyed by a blowtorch. The Bentons contended these gates did not prevent the Johnsons from accessing their own property. The Bentons also had photographs of Curtis destroying the Bentons' gates. Photographs from "trail cameras" further showed Curtis using the access road to enter the Bentons' private land. In July 2014, Curtis changed the locks on a gate, thereby preventing Paul Benton from accessing his adjacent property, resulting in the loss of his soybean crop.

¶6. In May 2015, the Bentons filed a motion for a temporary restraining order (TRO) because Defendants had refused to keep the gates closed on the access roads to the Bentons' hunting camp, which includes the northern border of the land being partitioned. Due to the

---

[3] *See* Miss. Code Ann. § 11-21-15 (Rev. 2019).

expensive equipment at the hunting camp, the Bentons were concerned about theft. The chancery court granted the motion and ordered Defendants to keep the gates shut. In response to the order, Curtis and his father Joe Lewis, now appearing pro se, filed a motion for contempt against the Bentons and to "dismiss the order," claiming the Bentons did not own the road where the gates were located and did not have permission to use it.

¶7. The Bentons denied any violation of the court's TRO and cited an incident when Paul and several hired men were working on the property and access road near his hunting camp. Paul claimed that on June 7, 2015, Curtis ripped the gate that secures the access road off its posts, thereby leaving his property unsecure. Days later, the Bentons filed an emergency motion for a TRO against Defendants, citing this destruction and several other similar incidents.[4] The Bentons attached photographs from trail cameras and affidavits that supported their contentions. The motion stated Curtis's actions were "irrational, malicious, and reckless," causing the Bentons, as well as their friends and workers, to fear for their safety. After a hearing, in August 2015 the chancery court entered a final decree granting the Bentons a permanent injunction. Curtis and Joe Lewis filed a motion to dismiss the court's TRO, contending that the Bentons did not own the land where their hunting lodge is; instead, this land was "the remaining property of the Walter Johnson Jr. estate," and further, the Bentons were attempting to adversely possess the land.

---

[4] In May 2015, the Bentons related how Curtis locked the Bentons out of their own property; thus, they had to cut the lock and install a new one. Another time, the lock and chain were found missing from the gate. Yet another time, Curtis and Joe Lewis entered the Bentons' private property and told the Bentons' workers they were trespassing. Finally, the Bentons claimed Curtis removed hidden trail cameras and placed "No Trespassing Johnson Estate" signs on the common property.

¶8.     On February 3, 2016, the four appointed special commissioners filed their report and recommendation on the Property, finding approximately sixty acres to be open land and valuing the remainder timber land at $48,000. A survey map divided the Property into four tracts, all fronting Highway 17. One tract comprised approximately 282 acres with a value of $1,500 per acre, with the remaining three tracts comprising about one acre each with a value of $750 per acre. The commissioners found the Bentons owned 60.20% of the property, and Defendants owned 39.80%; the commissioners accordingly divided the Property to result in the same percentages of total property value in timber and gravel. The division also gave the parties full access to their parcels with adequate public road frontage, interior travel roads, and buffering.

¶9.     Basing their division off the survey map, the commissioners divided the property into six tracts and suggested granting the Bentons approximately sixty percent of the total property value, with the remaining forty-percent value being granted to Defendants. Time and expenses for the commissioners' duties totaled approximately $56,000. Also on February 3, 2016, the parties, including Curtis, signed an agreed order. The Bentons received Tract 5 consisting of approximately 172 acres. Defendants were granted Tracts 1 through 4 and Tract 6, totaling approximately 113 acres. The agreed order provided "no Defendants shall be allowed on any portion of Plaintiffs' [the Bentons'] property identified as Tract 5. Likewise, Plaintiffs [the Bentons] shall not be allowed on Tracts 1-4 or Tract 6. Defendants agree that no Defendant shall have any access to the licensed roadway at any time." However, Curtis "repeatedly violated" the order by "blatantly trespassing" on the

Bentons' property, including private property that was not a part of the partition suit.

¶10.   On April 25, 2019, the Bentons filed a petition to cite Curtis for civil and criminal contempt after repeatedly requesting Curtis to cease trespassing.  The petition described an incident on October 10, 2018, when the Bentons and some friends were again working on the deer camp.  Curtis "barreled down the access road in his truck and into the field where they were working."  He approached Paul in a "violent and aggressive manner" and was shouting.  Paul asked someone to call the sheriff's department.  Curtis shouted in response that neither the sheriff nor the court could "do anything" to him because he was "an Indian."  The Bentons attached to their petition photographs from trail cameras showing Curtis trespassing that day.[5]  The Bentons exhorted the chancery court to punish Curtis for nearly eight years of endless harassment and trespassing, as well as thousands of dollars in needless attorney's fees and costs.

¶11.   On May 3, 2019, in response, Curtis filed a motion to dismiss Paul's petition for contempt, claiming he is a Creek Indian and subject to tribal sovereign immunity, which protects him and his family from particular suits, especially land disputes.  Curtis attached to his motion a statement to "Honorable Judges of Justice Court or any State Court" that his ancestors were "Indians" and that his great-grandfather Walter Johnson "had to reacquire

---

[5] In the petition, the Bentons explained that after the encounter, they filed criminal trespassing charges against Curtis in the Holmes County Justice Court the same day.  The justice court judge, however, dismissed the charges, directing Paul to file a petition for contempt in the chancery court's partition action.  In its final judgment of contempt, the chancery court found that while it had jurisdiction over a petition for contempt, the justice court had jurisdiction over prosecutions for criminal trespass, and the chancery court suggested that any future actions for criminal trespasses should be heard in justice court.

6

his ancestral lands." Further, he claimed his family had been in possession of these lands since 1840 "and have lived as Indians since then." He cited to the "Treaty With the Creeks 1790" and maintained that "[a]nything adverse to those treaties or any federal laws for Indians is a violation of our rights as Indian[s]." He argued that any case brought against the Creek Indians must be argued in "Tribal Courts." Curtis referred to himself as "Chief" of the "Creek Indian Tribe East of the Mississippi" and began signing his name to court documents with an "X."

¶12. On June 5, 2019, a hearing was held on Curtis's motion to dismiss and Paul's petition for contempt. Curtis, appearing pro se, explained that he had "filed papers at the courthouse" giving notice "that [the Johnsons] are Creek Indians that live East of the Mississippi [River] in Mississippi." Curtis testified that he traced his ancestry, which revealed that his family was not African-American but Creek Indian. Later, Curtis testified that he has lived his entire life "as an Indian." He claimed his great-grandfather Walter L. Johnson, who died in 1970, was a Creek Indian. The chancellor asked for proof, but Curtis responded that he did not bring it to court that day.

¶13. The Bentons' counsel accurately stated that the issue before the court was not whether Curtis was "an Indian or not"; the issue was the offenses he committed on Paul's private property. Further, the laws and cases Curtis cited to the court applied only to acts occurring on federally recognized reservations. In 1832, the Creek were compelled to cede "their original homelands east of the Mississippi for a reservation promised in what is now Oklahoma." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2464 (2020). Therefore, any "Creek

7

Tribe East of the Mississippi" does not have such a reservation. Counsel argued that there is no regulation that allows Curtis to trespass on someone else's property because he is allegedly a Native American. Further, Curtis waived any claim to tribal sovereign immunity because he had never asserted he was a Native American, only an African American. The chancellor denied Curtis's motion to dismiss from the bench, ruling that even if Curtis were immune as chief of his tribe, he did not prove his status as a Native American in a recognized tribe that would provide him with sovereign immunity.

¶14. Next, testimony was taken from Paul and Curtis regarding Paul's citation for contempt based upon the October 10, 2018 incident at Paul's hunting camp. Paul testified that Curtis pulled up to Paul and some workers, screaming about whether Paul "had seen a sign." Paul did not know what sign Curtis was talking about at the time.[6] Curtis was acting "belligerent, aggressive, and . . . frankly . . . a little crazy." Paul asked him to leave and respect the property lines settled by the courts. Curtis refused. Paul claimed he was on Tract 5 of the Property during the incident, and Curtis did not have permission to be there. Curtis's behavior had been increasingly "erratic," and he continuously crossed Paul's property to use an access road he had agreed not to use. Further, Curtis had allowed hunters to hunt on Paul's property without Paul's permission.

¶15. Curtis testified that the October 10 encounter was to inform Paul that he and his family were Creek Indians and that Paul was trespassing on his land. Curtis said that when Paul asked him to leave, he did. Further, he denied being belligerent, contending "we are

---

[6] Paul later testified that there are two signs on Curtis's property—one says "Johnson Estate Land Company," and the other says, "You are entering the Creek Indian Nation."

8

peaceful people." Curtis claimed that he was not trespassing under the partition order because he did not leave the gravel access road. He further refused to admit the road was in the midst of Paul's land.

¶16. After the hearing, the chancery court entered a judgment of contempt against Curtis for willfully entering the Bentons' Tract 5 land, as well as the licensed roadway, repeatedly. The chancellor noted the action was forbidden by the February 3, 2016 agreed order, which all the parties, including Curtis, had signed. He also noted that while the contempt matter should have been resolved by the Holmes County Justice Court, it was within the chancery court's authority to find Curtis in contempt.[7] Additionally, the court ordered Curtis to pay $5,000 for the Bentons' attorney's fees. Importantly, the chancery court found Curtis failed to offer "any evidence whatsoever" to prove he is Native American or that Tract 5 or the licensed roadway is "Indian Land." The court aptly stated, "This case has nothing to do with Indian tribal law but with the Order of Court and the laws of the State of Mississippi."

## STANDARD OF REVIEW

¶17. This Court employs a de novo standard of review for a trial court's grant or denial of a motion to dismiss. *Benson v. Neshoba Cnty. Sch. Dist.*, 102 So. 3d 1190, 1192-93 (¶8) (Miss. Ct. App. 2012). Questions of law such as jurisdictional issues are also reviewed de novo. *Jones v. Billy*, 798 So. 2d 1238, 1239 (¶2) (Miss. 2001). Regarding a citation for contempt, the standard of review "is determined upon the facts of each case and is a matter for the trier of fact." *Showers v. Norwood*, 914 So. 2d 758, 761 (¶11) (Miss. Ct. App. 2005)

---

[7] While Paul requested criminal as well as civil contempt, the chancellor did not imprison Curtis but stated any future violation would "be treated extraordinarily harshly."

9

(citing *Milam v. Milam*, 509 So. 2d 864, 866 (Miss. 1987)). Further, "[i]t is well-settled law that contempt matters are committed to the substantial discretion of the chancellor. This Court will not reverse a contempt citation where the chancellor's findings are supported by substantial credible evidence." *Id.*

## ANALYSIS

¶18. Curtis states that his appeal concerns whether he, claiming status as a Native American, can be cited for contempt of court for trespassing on his ancestral lands. Relatedly, he raises four issues: (1) the trial court should have applied Article VI of the United States Constitution to his case; (2) the trial court erred in denying his status as a Native American for "lack of proof"; (3) Native Americans or their descendants cannot be cited for contempt in Mississippi courts for trespass on their ancestral lands; and (4) a descendant of a Native American settler in Holmes County is entitled to the same laws that apply to all Native Americans.

¶19. The chancery court found this case had nothing to do with Indian or tribal law but with Curtis's blatant disregard of the laws and court orders of Mississippi. We agree and find none of Curtis's issues have merit. We shall first discuss the chancery court's denial of Curtis's motion to dismiss and then the chancery court's finding of contempt against Curtis.

### I. Curtis's Motion to Dismiss

¶20. Curtis argues the chancery court should have granted his motion to dismiss Paul's petition for contempt because he "asserted tribal immunity." Curtis claims that the chancery

10

court lacked jurisdiction over him as the self-proclaimed "Chief of the Creek Indian Tribe East of the Mississippi." He further contends the chancery court erred in failing to recognize his Indian status and improperly applied Mississippi law instead of federal Indian tribal law. Interestingly, it was not until Paul filed his petition for contempt in April 2019 that Curtis asserted that he is protected by tribal sovereign immunity.

¶21.    In *Jones v. Billy*, the Mississippi Supreme Court found that "where the cause of action arose on tribal land, federal law preempted the exercise of state court jurisdiction over a legal dispute between Mississippi Choctaw tribal members," a federally recognized Indian tribe. *Jones*, 798 So. 2d at 1239 (¶3). Further, "[i]n a civil suit initiated by a non-Indian against an Indian for a debt arising on [an] Indian reservation, the United States Supreme Court held that allowing 'the exercise of state court jurisdiction here would undermine the authority of the tribal courts over Reservation affairs . . . .'" *Id.* (quoting *Williams v. Lee*, 358 U.S. 217, 223 (1959)). To be subject to Indian tribal law, a party must first prove that he/she is a member of a recognized tribe and then that the action occurred on recognized tribal lands. Federal statutory law defines an "Indian" as "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood." 25 U.S.C. § 5129. As for being a Creek Indian, according to the tribe's official website, the current citizenship criteria for the Muscogee (Creek)

11

Nation[8] "is that you must be Creek by Blood and trace back to a direct ancestor listed on the 1906 Dawes Roll by issuance of birth and/or death certificates."[9] *See supra* note 8.

¶22. The chancery court correctly found that Curtis offered no proof that he or his

_____

[8] The Muscogee are also known as the Creek Indians. According to the tribe's website, "The Citizenship Board office is governed by a Citizenship Board consisting of five members. This office provides services to citizens of the Muscogee (Creek) Nation of Oklahoma or to potential citizens in giving direction or assisting in the lineage verification process of the Muscogee (Creek) people. The mission of this office is to verify the lineage of descendants of persons listed on the 1906 Dawes Roll. In doing so, research is involved in the whole aspect of attaining citizenship." Muscogee (Creek) Nation, Citizenship, https://www.muscogeenation.com/services/citizenship/ (last visited Oct. 5, 2021). A citizenship application must be submitted with required documents. *Id.* "[L]ineal research, which is the responsibility of the applicant, may or may not be required for a Citizenship application; this is dependent on each applicant's direct lineage to the original enrollee." *Id.*

[9] "Congress created the Dawes Commission in 1893 to create authoritative membership rolls for all Native American tribes in Oklahoma" (which included the Muscogee-Creek tribe). *Davis v. United States*, 199 F. Supp. 2d 1164, 1169 n.2 (W.D. Okla. 2002). The Commission created the Dawes Rolls in 1906, "which were citizenship lists dividing members into the 'Creek Nation Creek Roll,' allegedly comprised of Creek citizens with Creek blood and the 'Creek Nation Freedmen Roll,' allegedly comprised of Creek citizens who were formerly enslaved and devoid of Creek blood. The Dawes Rolls closed in 1907." *Muscogee Creek Indian Freedmen Band Inc. v. Bernhardt*, 385 F. Supp. 3d 16, 19 (D.D.C. 2019) (citations omitted).

Curtis does not argue that he or his ancestors were "Freedmen" but Indians by blood. Even if he did argue he was a descendant of the Freedmen, he offers no proof of this status either. Further, even if he proved it, the tribe currently does not recognize the Freedmen as tribal citizens: in 1979, the Muscogee (Creek) Nation (MCN) adopted a new constitution whereby Freedmen descendants are not entitled to tribal citizenship and are not recognized as citizens of the tribe. *Bernhardt*, 385 F. Supp. 3d at 19. The new constitution "stripped individuals on the 1906 Creek Freedmen Rolls and their then-living lineal descendants of their MCN citizenship; and [it] . . . prevented the unborn lineal descendants of individuals who were enrolled on the 1906 Creek Freedmen Rolls from becoming citizens of MCN." *Id.* Recently, however, the Muscogee Nation in Oklahoma is considering changes to their constitution that would allow descendants of Freedmen to become full tribal citizens. *See* Associated Press, *Two Oklahoma Tribes Consider Tribal Citizenship for Freedmen*, ABC News (May 28, 2021), https://abcnews.go.com/US/wireStory/oklahoma-tribes-tribal-citizenship-freedmen-77970134.

12

ancestors are Native American beyond his own testimony. Curtis attached to his motion to dismiss a self-written statement that he is a Creek Indian and that his community has its own tribal courts on the property, which is "Indian country"; therefore, he is immune from the laws of Mississippi. At the hearing on the motions, Curtis claimed to have proof that he and his family are Creek Indians, but he was "not prepared" to offer it to the court that day (nor did he ever offer it). Curtis now argues that his mere "existence and family's occupancy" of the Property is sufficient to prove his status as a Native American. We disagree. As the chancellor told Curtis, "[J]ust because you say it [doesn't] make it so."

¶23. While Curtis now claims he is chief of the Creek Indian Tribe East of the Mississippi, he offers no evidence to prove his membership or that this tribe is even legally recognized. In his brief, Curtis discusses the possible Native American ethnicity of his great-grandfather Walter and Walter's grandparents, but Curtis admits not knowing if these ancestors were Indian, African-American, or European. He then charges the chancery court with racial discrimination against him because it did not accept his Indian status without proof. However, even the Creeks themselves require more than just an individual's "word," i.e., proof of a direct ancestor listed on the Dawes Rolls.

¶24. Curtis cites numerous federal cases and statutes related to Native American law to support his tribal sovereign-immunity claim. However, because he fails to prove his membership in a federally recognized tribe, this authority is inapplicable. Curtis cites 18 U.S.C. § 1162[10] in support of his proposition that the trial court "lacked subject matter

---

[10] This code section provides certain states jurisdiction over criminal offenses committed by or against Indians in Indian country; Mississippi is not included as one of the

13

jurisdiction due to sovereign immunity" and that any suit involving Creek Indians must be heard in tribal courts. However, tribal sovereign immunity is only available to a federally recognized tribe, and Curtis fails to prove the "Creek Indian Tribe East of the Mississippi" is such a tribe.

¶25.    Curtis also cites 18 U.S.C. § 1151, which provides the definition of "Indian country,"[11] to support his claim that the land at issue is Indian country. Curtis also argues that Paul's private property is "ancestral land" that rightfully belongs to Curtis[12] and the Creek Indian Tribe East of the Mississippi due to various historical treaties entered into between Indians and the U.S. government. Curtis cites the Treaty with the Creeks of 1790, the Treaty of Dancing Rabbit Creek of 1830, and the Trail of Tears. The United States Supreme Court's recent decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2464 (2020), explained that in 1832 the Creek were compelled to cede "their original homelands east of the Mississippi for a reservation promised in what is now Oklahoma," and "in 1866, they ceded and conveyed a portion of that reservation to the United States." (Citing Treaty With the Creek, 1832, Art. I, Mar. 24, 1832, Stat. 366; Treaty With the Creek Nation of Indians, Art. III, June 14, 1866, 14 Stat. 786 (discussing state or federal court jurisdiction for an

states. 18 U.S.C. § 1162(a).

[11] This statute provides that "Indian country" means "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." 18 U.S.C. § 1151.

[12] The Bentons correctly note that Curtis is not, nor ever has been, a record title owner to the land at issue. According to the "First Amended Petition for Partition," Curtis's father, Joe Lewis Johnson (along with his four siblings), inherited an undivided interest in the property from his grandfather Walter Johnson.

14

Indian criminal defendant who committed sexual crimes in Indian country)). Because these lands are "ancestral," Curtis claims he could not be trespassing. Curtis states in his appellate brief that his family's "oral history" indicates they settled in Mississippi with other Indian tribes in the mid 1800s, and his great-grandfather Walter was an Indian who acquired over 1,000 acres of land in Holmes County. Curtis also states in his brief that he was told by his grandfather Henry Johnson that none of Walter's land "could be sold and that any of his descendants could farm, hunt, and fish as long as the land was there." This statement appears to be the basis for Curtis's contention that Paul was the trespasser on Curtis's "ancestral land." No evidence to this effect, however, was ever presented to the trial court, and therefore the statement cannot be considered on appeal. *See Gale v. Thomas*, 759 So. 2d 1150, 1159 (¶40) (Miss. 1999) ("[A]n issue not raised before the trial court is deemed waived."). Moreover, while statements concerning a person's ancestry are admissible under the hearsay exception of Mississippi Rule of Evidence 803(19) (Reputation Concerning Personal or Family History), Curtis presented no testimony or evidence to the trial court to support his contention about his ancestry. Additionally, this "oral history" statement in his brief contradicts Curtis's testimony at the hearing where he stated that he and his family thought they were African American but found out a few years ago that they were Creek Indians. Curtis also presented no proof that Paul's private land is part of a legally recognized Indian reservation or is "ancestral land"; thus, he could not validly enter Paul's land.

¶26. Curtis argues that private citizens cannot purchase lands from Native Americans,

citing *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543 (1823). However, *M'Intosh* dealt with determining the power of the federal government to extinguish Indian title to land. *Id*. at 604-05. In *M'Intosh*, two Indian tribes sold Thomas Johnson title to some land in Illinois before American independence. *Id.* at 559-60. After independence, the tribes sold the same land to the United States government, which then sold it to William M'Intosh. *Id.* at 560. The United States Supreme Court upheld M'Intosh's ownership and "refused to recognize land titles originating in grants by Indians to private parties . . . ." *Oneida Indian Nation of New York State v. Oneida County*, 414 U.S. 661, 669-70 (1974) (citing *M'Intosh*, 21 U.S. (8 Wheat.) at 604-05). "[T]hose grants were contrary to the accepted principle that Indian title could be extinguished only by or with the consent of the general government." *Id.* at 669. However, the federal government could grant non-Indians land held by Indian tribes, but the grantees took title subject to the Indian "right of occupancy" because the Indians had used and occupied the land since "time immemorial." *Id.* at 664, 667-68 (citing *M'Intosh*, 21 U.S. (8 Wheat.) at 550, 574). *M'Intosh* does not further Curtis's argument, nor is the case applicable here, as we have neither a federally recognized tribe nor Indian land at issue.

¶27. In sum, the chancery court did not err in denying Curtis's motion to dismiss or declining to apply Indian tribal law because Curtis failed to offer any evidence he or his ancestors are Indian or that the Property is Indian country or ancestral lands.

## II. Paul's Petition for Contempt

¶28. Curtis's citation for contempt of the February 3, 2016 agreed order is the crux of this case. However, Curtis makes no specific arguments related to it beyond claiming he was not

16

trespassing on Paul's private land because of his rights as a Native American. Regardless, we shall address the chancery court's proper citation of contempt against Curtis for his repeated trespass onto Paul's private property.[13]

¶29. A chancellor is allowed "wide discretion in 'exerting his [or her] coercive powers to enforce his [or her] decrees.'" *Hanshaw v. Hanshaw*, 55 So. 3d 143, 147 (¶13) (Miss. 2011) (citing *Matthews v. Matthews*, 227 Miss. 358, 360, 86 So. 2d 462, 462 (1956)). "Civil contempt orders enforce a private party's rights or compel compliance with a court's order." *Id.* (citing *Purvis v. Purvis*, 657 So. 2d 794, 796 (Miss. 1994)). "[A] citation for criminal contempt [is] to vindicate the dignity and authority of the court" when the offending party "has wilfully, deliberately and contumaciously ignored the court, or the court's directive." *In re Smith*, 926 So. 2d 878, 887-88 (¶13) (Miss. 2006). A reviewing court "will not reverse the chancellor's finding of contempt unless the decision was manifestly wrong." *Lewis v. Pagel*, 172 So. 3d 162, 178 (¶39) (Miss. 2015) (citing *Gutierrez v. Gutierrez*, 153 So. 3d 703, 713 (¶31) (Miss. 2014)).

¶30. Curtis participated, through counsel, in the negotiations regarding the partition of the Property. On February 3, 2016, he, along with the other parties, signed the agreed order, which explicitly stated that Defendants were not to enter "Tract 5," while the Bentons could not enter "Tracts 1-4" and "Tract 6." However, since signing the order, the Bentons showed Curtis had repeatedly trespassed on Tract 5, as well as Paul's private property, with impunity. The chancery court was within its authority to enforce the agreed order. The

---

[13] While Paul requested both civil and criminal contempt, only a citation for civil contempt was issued.

chancellor's findings of contempt were supported by substantial evidence.  Therefore, the

chancery court did not abuse its discretion in granting Paul's petition for contempt.

¶31.   **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.  WESTBROOKS AND EMFINGER, JJ., NOT PARTICIPATING.**