# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01090-COA

**THOMAS KEVIN BRASWELL**                                                          **APPELLANT**

**v.**

**LADONNA JO BRASWELL**                                                              **APPELLEE**

DATE OF JUDGMENT:               07/24/2020
TRIAL JUDGE:                    HON. PERCY L. LYNCHARD JR.
COURT FROM WHICH APPEALED:      GRENADA COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:        A. E. (RUSTY) HARLOW JR.
                                KATHI CRESTMAN WILSON
ATTORNEYS FOR APPELLEE:         A. LEE ABRAHAM JR.
                                JACOB MICHAEL JENKINS
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
DISPOSITION:                    REVERSED AND REMANDED - 11/09/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE WILSON, P.J., WESTBROOKS AND McDONALD, JJ.

## McDONALD, J., FOR THE COURT:

¶1.     Thomas Kevin Braswell appeals the judgment of the Grenada County Chancery Court denying his petition to modify his child support and alimony obligations, and finding Kevin in contempt for the arrearages he owed. Upon a review of the record, we reverse the chancery court's judgment and remand for further proceedings.

## Facts

¶2.     Kevin and Ladonna Braswell were married on May 27, 1989. At the time of their divorce, they had three children; two were emancipated and one was a minor. At the time of the proceedings relevant to this appeal, the minor had been living with Kevin and

attending college.

¶3.    Kevin initiated the divorce action on December 18, 2015.  He agreed to a temporary order obligating him to pay all household expenses, Ladonna's car payment, all credit card payments, home insurance payments, all other bills of the parties, $400 per week in child support and $400 per week in alimony.  Although Ladonna counterclaimed for divorce on fault grounds, they later agreed to an irreconcilable-differences divorce.  The divorce judgment incorporated a property settlement agreement providing that Kevin must pay Ladonna $2,500 per month in child support, and $4,500 per month in alimony.  At the time of the divorce, Kevin was working as an ophthalmologist and earning $280,000 per year. Kevin was to continue paying Ladonna alimony until she remarried, cohabited, or reached the age of sixty-two.[1]

¶4.    After the divorce, Kevin bought his own home, which he financed with a loan from the Department of Veterans Affairs.  Ladonna ultimately moved to Louisiana.  She had been and remained unemployed at the time of the hearing on the matter that is at issue in this appeal.[2]  In March 2020, the minor child moved in with Kevin.

¶5.    In 2018, Kevin started experiencing financial problems.  His brother, a practicing

---

[1] Other salient terms of the property settlement agreement included Kevin's obligations to transfer ownership of the family home to Ladonna; pay Ladonna $100,000 upon the entry of divorce; pay for the minor child's college education; and that Ladonna receive $200,000 of Kevin's $400,000 deferred PERS retirement account when it became accessible.

[2] Ladonna testified that she went to college for less than two years, and that she had worked at a bank doing proofing "but that was thirty years ago."  She had applied for work at several banks and as a teacher's assistant without success.  She sought no other vocational training.

dentist with whom he shared an office building, unexpectedly moved his practice, leaving Kevin solely responsible for all of the building's expenses. Kevin testified that he struggled but he paid his child support and alimony "off the top" of the income from his practice through August 2018. He said that he had "to rob Peter to pay Paul" after his brother pulled out and the stress of unpaid bills grew heavier and heavier. According to Kevin, he did not handle it well and started self-medicating with alcohol. Even so, he testified that it did not interfere with his performance on the job.

¶6. In September 2018, law enforcement stopped and ticketed Kevin for driving under the influence. The charge was ultimately dismissed for lack of evidence, but the medical licensing board began an investigation. Kevin was required to suspend his practice while he was being evaluated. The Mississippi Physicians Health Program then required that Kevin attend an inpatient treatment program at Bradford Health Services or lose his license. Kevin attended the eight-week program from September 16, 2018 through November 15, 2018. Kevin was unable to work during that time and he had no partner to carry on the practice. As a result, he had no income during that time. Thereafter, the licensing board required that he sign a contract which limited his work hours to four days a week for five years.

¶7. On October 3, 2018, Kevin filed a motion to modify the divorce judgment by reducing the amount of alimony and child support that he was required to pay. He also sought relief of other financial obligations under the divorce judgment. On October 25, 2018, Ladonna answered the motion and counterclaimed for contempt.

¶8. Between December 2018 and April 2019, Kevin faced continuing financial

difficulties. Upon his return from treatment, the clinic was out of money and he had to fire several employees. He fell behind on the clinic note and other bills, including his federal taxes and his own house note. Kevin finally filed a Chapter 7 bankruptcy on March 13, 2019. Based on the pendency of his bankruptcy, he successfully sought to stay the chancery court modification and contempt proceedings. The bankruptcy was completed in September 2019. As a result, Kevin lost the clinic building and the home he had purchased.

¶9. After his bankruptcy, Kevin had to move his practice to a new office space. He had to pay the bank $13,000 to allow him to stay in the clinic that it had taken over while he found a new location. He also had to close his office for two weeks to accomplish the move, which cost him between $5,000 and $6,000. He had no income for the time the office was closed. He was able to reopen in October 2019, but business was slow through that December because many patients were unaware of his new location.

¶10. In 2020, Kevin's business suffered another financial blow due to COVID-19. Pursuant to a notice from the state medical board, he had to totally shut down his office from March 18, 2020 to the beginning of April 2020, unless a patient experienced an emergency. He was allowed to reopen in a limited capacity during April and May 2020. And due to hospital restrictions, he was unable to perform elective surgeries that previously provided a supplemental source of income. He testified that he was not eligible to receive any funds from the CARES Act Paycheck Protection Program, a federal emergency assistance program for small businesses affected by the pandemic. Kevin drew unemployment for approximately a month in June 2020. He applied for additional work at the G.V. (Sonny) Montgomery VA

4

Medical Center and the University of Mississippi Medical Center in Jackson, as well as with several private practices, but he was unable to find other employment. He could not "moonlight" at an emergency room because, as an eye doctor, he did not have the skill set required for that kind of practice.

¶11.    During this time, Kevin remarried. His wife worked as his office manager despite the fact that she had not been paid after October 2019. They lived in a home that his wife and her grandmother co-signed to purchase; Kevin's name did not appear on the title. Kevin's mother-in-law gifted them with the $3,000 down payment for the house. Their monthly note on the 1100 square foot home was $600. Kevin testified that he and his wife had not taken any vacations, and they had attended only one concert, paying $200 for the tickets.

¶12.    At the time of the 2016 divorce, Kevin testified that he was making approximately $280,000 per year. His adjusted gross income on his 2017 tax return was $180,529. In 2018, it dropped to $165,570.[3] In 2019, it was $54,363. The testimony established that through August 2018, Kevin was current on both his child support and alimony payments. In September 2018, he paid the $4,500 alimony payment, but nothing in child support. In October, he paid $2,500 in child support, but nothing in alimony. He made no further payments in 2018. In 2019, he made no alimony payments and only one child-support payment. Through July 2020, he paid a total of $4,000 in child support.

¶13.    On June 2, 2020, the chancery court entered a Qualified Domestic Relations Order that affirmatively established Ladonna's right to $200,000 of Kevin's PERS deferred

---

[3] In 2018, gross income for the clinic as a whole was $607,278.

compensation benefits plan. It further ordered the Plan Administrator to establish a separate account for Ladonna and transfer Ladonna's $200,000 share to that account.

¶14. The chancery court heard the parties' motions on July 13, 2020, with Kevin appearing via Zoom because he was quarantined due to exposure to COVID-19.

¶15. At the time of the hearing, Kevin was behind on the rent for the clinic and on the lease payments for the clinic's equipment. During his quarantine, Kevin saw no patients and generated no income. He testified that he had received a $1,200 stimulus check that he used to make a partial payment on the child support that he owed. He owned no real property and had no assets other than his deferred compensation plan, which had a $400,000 balance in which Ladonna held a half interest per the divorce judgment.[4] He testified that he would gladly access that to help resolve the matter. He had paid his 2017 taxes, but not his 2018 or 2019 taxes, which his wife estimated to be approximately $50,000 to $60,000.

¶16. During the hearing, the chancery court questioned Kevin about some of his obligations and the genesis of his problems.

> THE COURT: Okay. Would you agree with me that everything that has come about has been the result of your drinking then as far as your financial is concerned, except for the COVID here lately?
>
> THE WITNESS: Well, for the most part, Your Honor, I think, you know, like I alluded to earlier, the problem really started when my brother left the practice and left me with, like I said,

---

[4] Kevin testified that he owned a small interest in an oil exploration company that he had acquired in 1997 for $19,000. The company acquired old wells and attempted to extract further oil through fracking. But its business had dwindled from four wells to one that Kevin believed had also been capped. He said he had not received any income from the interest in years and would gladly transfer his ownership to Ladonna.

you know, his end of the businesses which doubled my overhead basically.

THE COURT: All right. Explain that to me because - -

THE WITNESS: It was a snowball effect that started it all, quite frankly.

THE COURT: Well, I understand from your testimony, you're not an optometrist but an ophthalmologist; is that correct?

THE WITNESS: Yes, sir.

THE COURT: And he was a dentist?

THE WITNESS: Yes, sir.

THE COURT: So what overhead did you share? It wasn't equipment or anything, obviously. Was it employees? Obviously, it was either a mortgage or rent. What were your shared expenses, and how much were they?

THE WITNESS: Our shared expenses remained in the building, utilities. I think just my electrical bill was $500. I don't know how much it was together. But we had -- it was almost a 5,000 square foot building. We had taxes and insurance. I don't remember what insurance was. All of that, yes, sir.

THE COURT: And that led to your drinking which led to your further financial problems?

THE WITNESS: Yes, sir, more or less.

¶17.   Kevin's wife Amber Braswell testified as well. She said that the clinic's checking account had a $10,000 balance, but $5,400 would be needed to make payroll. She confirmed that Kevin had no other assets. She was cross-examined at length about each expense reflected in Kevin's and the clinic's bank statements, and established that they were bona fide work-related expenses.

7

¶18.    Ladonna testified that she lived in her brother-in-law's grandmother's house. She said that because of Kevin's failure to pay alimony and child support, she had depleted her savings, sold personal items, and maxed out her credit cards. She had to buy her son a car that Kevin had promised him. Before the divorce, they had a "pretty good lifestyle." But since Kevin had not met his obligations, she had to see a psychologist for mental exhaustion. She said she had not asked Kevin to sign anything releasing her $200,000 share of the deferred compensation benefits because she was told it could not be accessed until he reached the age of seventy. Ladonna also testified that the two older children were paying the student loans that Kevin claimed he owed.[5]

¶19.    At the end of the hearing, the chancery court issued its ruling from the bench. The court noted the difference between periodic alimony, which is modifiable, and lump-sum alimony, which is not. Because Kevin was making periodic alimony payments and the expiration of the alimony was fixed, the court found it to be a hybrid form of the two. The court said it was much like rehabilitative alimony, which is awarded for a fixed term until a former spouse can become self-sufficient. As such, the court found that the monthly alimony payment was subject to modification, but went on to note that modification may only be granted if there had been a material and substantial change in circumstances arising after the divorce that was not reasonably anticipated. The court cited *Poole v. Poole*, 701 So. 2d 813, 818 (¶24) (Miss. 1997), in which the Supreme Court held that a former husband's drinking

_____

[5] On his Uniform Chancery Court 8.05 financial statement, Kevin listed $100,000 owed to the U.S Department of Education for the student loans that his two older children had incurred. Kevin said that he was responsible for paying the student loans, but he had been unable to make the payments.

that affected his work was not a post-divorce event that was not reasonably anticipated at the time of the divorce. Therefore, the circumstances in *Poole* did not support modification of child support. *Id* at 818-19 (¶24). The chancery court found that Kevin had given three reasons for his reduced income, none of which qualified as a basis to modify Kevin's obligations. The court found that Kevin had failed to show with particularity the type and amount of the expenses he had to absorb after his brother moved his dentistry practice, so that change was not a material and substantial change in circumstances. Additionally, the court found that Kevin's "self medication" with alcohol was self-inflicted and thus could not be considered unanticipated. Finally, the court noted that as of July 2020, the COVID-19 restrictions had only been in effect for three months and others had suffered financially as well. Consequently, the court found that the COVID-19 pandemic did not rise to the level of a material and substantial change in circumstances.

¶20. After denying Kevin's motion for modification, the chancery court turned to Ladonna's motion for contempt. Ultimately, the court found that Kevin failed to demonstrate his inability to pay with the necessary particularity, saying

> And to basically say that ["]I have office debts that I have to pay and keep current["] or ["]I have debts for my other children which I must pay for which I'm obligated, whether I'm paying them or not,["] falls far below the standard needed by a preponderance of the evidence to show an inability to pay. Again, that must be shown with particularity.

The court further found that it was hard to believe that Kevin's bankruptcy did not relieve him of certain debts and that he was not as destitute as he claims. In the chancery court's view, for Kevin to have paid so little over the past few years showed that he put payment of

9

his child support and alimony obligations at the bottom of his list. Accordingly, the chancery court found Kevin in contempt, granted Ladonna a judgment of $144,000, placed a lien in that amount on Kevin's share of the deferred benefits plan, and ordered Kevin to be incarcerated at the end of his quarantine period until he paid the judgment in full. The chancery court also allowed Ladonna's attorney to submit documentation of the attorney's fees that she requested.

¶21. On July 24, 2020, the chancery court entered a written order consistent with its bench ruling. Kevin withdrew $100,000 from his share of the deferred compensation plan and added the $10,000 he had in his business account to pay towards the contempt judgment. He filed a motion to stay his incarceration. The court entered an order on July 29, 2020, lifting the incarceration order after acknowledging Kevin's $110,000 payment. It allowed Kevin to pay the remaining balance of $34,000 at $1,000 per month. But the court also awarded Ladonna $14,000 in attorney's fees that Kevin was required to pay immediately. After filing an unsuccessful motion for reconsideration, Kevin appeals.

¶22. On appeal, Kevin raises two issues: (1) whether the chancery court erred in denying his request to modify his child support and alimony obligations; and (2) whether the chancery court erred in finding that he had failed to prove an inability to pay his arrearages.

**Standard of Review**

¶23. "We review a chancellor's modification of child support under an abuse-of-discretion standard of review." *Curry v. Frazier*, 119 So. 3d 362, 366 (¶14) (Miss. Ct. App. 2013), (citing *Moulds v. Bradley*, 791 So.2d 220, 226 (¶14) (Miss. 2001)). Legal questions are

10

reviewed de novo. *Cadigan v. Sullivan*, 301 So. 3d 779, 783 (¶19) (Miss. Ct. App. 2020). "We will not disturb a court's findings 'when supported by substantial evidence unless the chancery court abused its discretion, was manifestly wrong or clearly erroneous, or an erroneously legal standard was applied.'" *Smith v. Smith*, 318 So. 3d 464, 491 (¶18) (Miss. Ct. App. 2021) (quoting *Taylor v. Timmons (In Re C.T.)*, 228 So. 3d 311, 315 (¶6) (Miss. Ct. App. 2017)).

¶24. "Contempt matters are committed to the sound discretion of the trial court[,]" and "[t]he reviewing court will not reverse the chancellor's findings if they are supported by substantial credible evidence." *Doyle v. Doyle*, 55 So. 3d 1097, 1110 (¶44) (Miss. Ct. App. 2010).

**Discussion**

I. **Whether the chancery court erred in denying Kevin's request to modify his child support and alimony obligations.**

¶25. Kevin argues that he had experienced a significant reduction in his income since the time of the divorce judgment. He further argues that the reduction was unanticipated, unforeseen, and beyond his control. He reasons that his reduced income is a substantial material change in circumstances that warrants a reduction in his court-ordered child support and alimony payments. Ladonna argues that the chancery court's findings were within its discretion.

¶26. Mississippi Code Annotated section 93-5-23 (Rev. 2013) vests chancery courts with the authority to modify divorce decrees. *Easterling v. Easterling*, 245 So. 3d 548, 550 (¶8) (Miss. Ct. App. 2018). Where substantial and material changes in circumstances exists,

11

Mississippi law is clear that parties may request child-support modification. *See Evans v. Evans*, 994 So. 2d 765, 770 (¶16) (Miss. 2008). The person seeking the modification bears the burden of proof, *Bailey v. Bailey*, 724 So. 2d 335, 337 (¶6) (Miss. 1998), and must show that there has been a change in circumstances that was not reasonably foreseeable at the time of the original judgment. *Dixon v. Dixon*, 238 So. 3d 1191, 1198 (¶26) (Miss. Ct. App. 2018).

¶27. Similarly, an award of alimony may be modified upon a showing that there have been material and unforeseen changes in the circumstances of the parties. *Holcombe v. Holcombe*, 813 So. 2d 700, 703 (¶11) (Miss. 2002) ("A chancellor has the authority to modify periodic alimony 'upon a finding of a substantial change in circumstances, regardless of any intent expressed by the parties to the contrary,'" but the 'change in circumstances must not be anticipated by the parties at the time of the original decree."). After determining that such circumstances have occurred, the chancery court must then apply the *Armstrong* factors to determine the appropriate amount of alimony.[6] "As in all alimony-modification cases,

---

[6] The *Armstrong* factors include:

1. the income and expenses of the parties;
2. the health and earning capacities of the parties;
3. the needs of each party;
4. the obligations and assets of each party;
5. the length of the marriage;
6. the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. the age of the parties;
8. the standard of living of the parties, both during the marriage and at the time of the support determination;
9. the tax consequences of the spousal support order;

12

alimony, if allowed, should be reasonable in amount, commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay." *Easterling*, 245 So. 3d at 551 (¶10) (internal quotation mark omitted). Alimony awards in excess of a spouse's ability to pay are "per se unreasonable." *Sheffield v. Sheffield*, 55 So. 3d 1142, 1145 (¶9) (Miss. Ct. App. 2011) (citing *Yelverton v. Yelverton*, 961 So. 2d 19, 28 (¶18) (Miss. 2007)).

### A.     Alimony

¶28.    As mentioned, to modify an alimony order, the court must find a material change that could not have been anticipated by the parties at the time of the divorce decree. *Dixon*, 238 So. 3d at 1198 (¶26) ("[T]he change in circumstances must be one that was not reasonably foreseeable at the time of the original judgment."). For example, in *Spradling v. Spradling*, 362 So. 2d 620, 624 (Miss. 1978), an ex-wife's receipt of funds from the sale of the home did not justify a modification because the sale was contemplated in the divorce decree. And in *Dill v. Dill*, 908 So. 2d 198, 202 (¶12) (Miss. Ct. App. 2005), we affirmed the denial of a modification based on income reduction because both parties were aware at the time of the divorce that the ex-husband planned to leave the Marine Corps.

---

10.    fault or misconduct;
11.    wasteful dissipation of assets by either party; or
12.    any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Holcombe*, 813 So. 2d at 703 (¶12) (citing *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)). In this case, because the chancery court found that Kevin had not shown an unforeseen material change in circumstances since the divorce judgment, the court did not proceed to an analysis of the *Armstrong* factors.

¶29. In this case, the chancery court relied upon *Poole* in refusing to modify Kevin's alimony obligation because, in its view, Kevin failed to prove an unanticipated and unforeseeable material change in his circumstances. But this case is distinguishable from *Poole*. In *Poole,* the ex-husband sought a modification of his $2,000 per month child-support obligation. *Id*. at 814 (¶¶3-4). The ex-husband claimed that he began drinking heavily, entered rehab, and after four months back at work, he was placed on disability. *Id*. at 815 (¶6). The chancery court denied his request for modification, finding among other things, that the ex-husband admitted in his pleadings that he drank heavily before the divorce. *Id*. at 818 (¶24). The supreme court said that it appeared that:

> [P]rior to entering the joint settlement agreement, [the ex-husband] knew or at least should have known that he had a drinking problem that might affect his income. Therefore, this Court holds that the chancellor was not manifestly wrong in finding that any decrease in income was not due to after-arising circumstances not reasonably anticipated at the time of the agreement.

*Id*. at 818-19 (¶24) (internal quotation marks omitted). In this case, there was nothing in the record to indicate that Kevin had a drinking problem at the time of the 2016 divorce or that he should have anticipated a future loss of income due to it. The testimony established that Kevin began drinking in 2018, two years after the divorce, allegedly from the stress of having to absorb the entire expense of the clinic when his brother left.

¶30. Other facts in this case are distinguishable from those in *Poole*. In *Poole*, the ex-husband's income had only slightly decreased from $4,718.97 per month at the time of the divorce, to $4,344.27. *Id*. at 815-16 (¶¶8-14). In this case, Kevin's income went from $280,000 in 2016 to approximately $54,000 in 2019. He lost further income in 2020 from

14

closures due to COVID-19. The chancery court acknowledged that the closures financially affected Kevin. Further, in *Poole*, the ex-husband took a job as a general physician at the Mississippi State Hospital rather than return to his OB/GYN practice. *Id*. at 815 (¶8). No licensure board or other organization prevented the ex-husband from practicing his specialty; he had voluntarily chosen not to do so. *Id*. at 818 (¶21). In this case, there was undisputed testimony that after November 2018, the medical licensing board had mandated that Kevin practice only four days a week. Any reduction in income that resulted was involuntary on Kevin's part.

¶31. Finally, in *Poole*, the ex-husband had sold his interest in a limited partnership for $300,000, which he spent on himself (a $200,000 house, a $50,000 annuity, and a $50,000 loan/investment) rather than paying child support. *Id*. at 815 (¶9). The court found that the ex-husband was enjoying the same lifestyle as he had prior to the divorce. *Id.* at 818 (¶22). In this case, Kevin experienced no such windfall. If anything, things went from bad to worse—rehab, to limited income, to delinquent debts, to bankruptcy, to COVID-19 closures. He did not buy a new home. Instead, his wife and her grandmother co-signed for a loan to purchase a relatively modest $86,000 home.

¶32. More applicable to this case are those cases in which the party seeking modification has tried to pay but was financially unable to do so because of an unanticipated post-divorce loss of income. For example, in *Easterling*, we affirmed a chancery court's finding that an ex-husband's unforeseen job loss resulting in a loss of income warranted a reduction in his alimony obligation. *Easterling*, 245 So. 3d at 552 (¶16). In that case, the parties were

15

married for thirty-seven years before they divorced. *Id*. at 550 (¶2). In their property settlement agreement, the husband agreed to pay $2,500 per month in alimony. *Id*. Two years after the divorce, due to circumstances in the oil industry beyond his control, the ex-husband was terminated and had no regular income. *Id*. at (¶3). He unsuccessfully attempted to find other employment. *Id*. The chancery court found that the ex-husband's termination was an unanticipated, unforeseen loss of employment that resulted in a substantial material change in his circumstances. *Id*. at (¶5). It applied the *Armstrong* factors and reduced the ex-husband's alimony obligation to $1,000 per month. *Id*. The ex-husband appealed, arguing that his obligation should have been lower or eliminated altogether. *Id*. at (¶7). We disagreed with the ex-husband, but upheld the chancery court's reduction as neither manifest error nor an abuse of discretion. *Id*. at 552 (¶16).

¶33. Similarly, in *McEwen v. McEwen*, 631 So. 2d 821, 823 (Miss. 1994), a father sought to reduce his child-support obligation because of a drastic reduction in his income post-divorce. The chancellor denied his request and our supreme court reversed. *Id.* at 823-24. The proof showed that the father had earned approximately $52,000 per year before his divorce but only around $28,000 at the time of the modification hearing. *Id*. at 822. Of his approximate $1,400 monthly take-home pay, he was required to pay $800 per month in child support. *Id.* The supreme court held that the father was entitled to lead a decent life and that the chancellor's refusal to modify his support obligation would not allow him to do so. *Id*. at 824.

¶34. In this case, the chancery court was manifestly in error in denying Kevin a

16

modification in his alimony payments. Contrary to the chancery court's findings, Kevin did not claim that he was entitled to a modification because of his increased clinic expenses when his brother left. In fact, Kevin testified that when his brother moved his dentistry practice, he robbed Peter to pay Paul" for several months in an effort to make his child support and alimony payments until he could no longer do so. That occurred when the medical licensing board became involved. Testimony about his brother leaving merely explained the increased clinic expenses that later went into default and the increased stress Kevin experienced which he claimed led him to drinking heavily.

¶35.   The chancery court further erroneously found that Kevin's "self-medication" was self-inflicted and thus could not be considered an unanticipated after-arising change in circumstances. As mentioned above, there was no evidence that Kevin drank heavily prior to the divorce. Consequently there was no basis to infer that his later loss of income should have been anticipated. Instead, Kevin's loss of income partially stemmed from a DUI ticket that alerted the licensing board to his drinking. Were we to accept the chancery court's logic, then no modification could be granted to a person whose reckless behavior leads to a loss of income. In addition, the fact that Kevin voluntarily complied with the licensing board's mandates should not be held against him; he had no choice but to comply or lose his license, livelihood, and ability to pay at all. He also had no choice but to agree to the five-year contract with the board that capped his ability to work at four days a week for the next five years.

¶36.   Finally, the chancery court failed to find that the COVID-19 closures of Kevin's clinic

17

and the resulting loss of income were not reasonably foreseeable at the time of the original judgment. That others suffered financially from the pandemic does not change the fact the mandated office closure was a material change in circumstances that was not foreseeable when Kevin and Ladonna divorced in 2016.

¶37. In this case, as in *McEwen*, Kevin's income plummeted to a fraction of what it was at the time of the divorce—from $280,000 in 2016 to $54,363 in 2019. On this income, it was impossible for Kevin to pay his child support and alimony payments which totaled $84,000 per year. He had virtually no other assets; his clinic building and first home were lost. His working hours were curtailed by the agreement with the medical licensing board. He unsuccessfully sought other work.

¶38. Therefore, we find that the chancery court was manifestly wrong in denying Kevin's request for a modification of his alimony payments. The cumulative effect of Kevin's increased office expenses, his reduced working hours, and the mandatory COVID-19 office closures resulted in considerable reductions in Kevin's income and entitled him to a modification. We remand the matter for the chancery court to grant the modification and proceed with an analysis of the *Armstrong* factors.[7]

### B. Child support

¶39. The chancery court was also manifestly wrong in refusing to modify Kevin's child-support obligation when the proof showed that the minor child had been living with Kevin

---

[7] Kevin's payment of $110,000 pursuant to the chancery court orders, along with Ladonna's access to her $200,000 portion of Kevin's deferred compensation plan should be considered in the chancery court's assessment.

since March 2020. "[O]ur supreme court has also held that because child support is given strictly for the benefit and protection of the child[,] when physical custody is changed and a child comes to live with the parent who was previously ordered to pay child support, there was no logical reason for the child support payments to continue." *Frazier v. Burnett*, 767 So. 2d 263, 267 (¶8) (Miss. Ct. App. 2000) (internal quotation marks omitted) (citing *Nichols v. Tedder*, 547 So. 2d 766, 781 (Miss. 1989)). In this case, it is undisputed that Kevin and Ladonna's remaining minor child moved in with Kevin in March 2020. Therefore, the chancery court erred in not relieving Kevin of his child-support obligation. Moreover, Kevin should be given a $12,500 credit on the total arrearage he owed for the months of March through July 2020.

## II. Whether the chancery court erred in finding that Kevin failed to prove his inability to pay the arrearages.

¶40. Kevin argues that he was not in contempt because the evidence he presented proved that he was unable to pay the child support and alimony obligations. However, the chancery court determined that Kevin had not proven his inability-to-pay defense with the particularity needed. We disagree.

¶41. Chancellors have substantial discretion regarding contempt matters. *Hunt v. Hunt*, 289 So. 3d 313, 317 (¶11) (Miss. Ct. App. 2019) (citing *Gutierrez v. Gutierrez*, 153 So. 3d 703, 713 (¶31) (Miss. 2014)). Failure to comply with a court order is prima facie evidence of contempt which must be shown by clear and convincing evidence. *Weeks v. Weeks*, 29 So. 3d 80, 86 (¶23) (Miss. Ct. App. 2009). "When the moving party has shown that the respondent has failed to comply with the judgment, the burden shifts to the respondent to

19

show that his failure to comply with a court's decree was not willful or intentional and without fault." *Id*. (internal quotation marks omitted). "A defendant may avoid a judgment of contempt by [showing] that he is without the present ability to discharge his obligations." *Wilson v. Stewart*, 171 So. 3d 522, 527 (¶16) (Miss. Ct. App. 2014). "We do not know how to over-emphasize that the law in Mississippi is [that] inability to currently discharge an obligation in a civil contempt case is a defense to a judgment of contempt." *Riser v. Peterson*, 566 So. 2d 210, 211 (Miss. 1990) (capitalization omitted). However, the defendant must prove his inability to pay "in particular terms." *Id.*

¶42. An instance in which the chancery court rejected a claim of inability to pay is found in *Stribling v. Stribling*, 960 So. 2d 556 (Miss. Ct. App. 2007). There, the ex-wife failed to pay court-ordered alimony. *Id*. at 558 (¶2). She presented bank statements, her company's financial records, outstanding bills, and promissory notes to prove that she was unable to pay. *Id*. at 559 (¶8). However, the records showed that for the relevant period of time (approximately seventeen months), her business's deposits were $971,051.81 and the business expenses were only $643,852.85, leaving her with more than $325,000 in disposable income. *Id*. at 560 (¶8). The chancery court also found nineteen occasions where the ex-wife had manufactured numbers that did not exist. *Id.*

¶43. To prove an inability to pay, "a defendant must prove 'that she earned all she could, that she lived economically, and paid all surplus money above a living on the alimony decreed to her [ex-]husband." *English v. Davenport*, 253 So. 3d 357, 361 (¶8) (Miss. Ct. App. 2018) (quoting *Lane v. Lane*, 850 So. 2d 122, 126 (¶12) (Miss. Ct. App. 2002)). "The

20

payment of other debts or expenses will not excuse or justify her default, unless such payment was necessary in order to continue her business or occupation, because her [ex-] husband's right to alimony is a prior and paramount claim on her earnings." *Id.* In that case, the ex-wife failed to make alimony payments and the proof showed that she spent lavishly on meals and several trips over the course of a year; her expenses were "out of control," and she continued to live as she always had: with no budget and just spending at will. *Id.* We held that there was "substantial credible evidence to support the chancellor's decision that [the ex-wife] had not been living as economically as possible and contributing everything she could toward her alimony obligation." *Id*. at 362 (¶10). Along the same line is *Lane v. Lane*, 850 So. 2d 122 (Miss. Ct. App. 2002). There, the supreme court said that the ex-husband had not shown an inability to pay and further that he did not show that he earned all he could; there was no proof that he had searched for other employment and he had purchased a new pickup and spent surplus funds on himself. *Id* at 125-26 (¶10).

¶44.    In this case, Kevin failed to pay alimony and child support as he had agreed and the court ordered in 2016, which established a prima facie case of contempt. *See McIntosh v. Dep't of Human Servs*., 886 So. 2d 721, 724 (¶11) (Miss. 2004); *Evans v. Evans*, 75 So. 3d 1083, 1087 (¶14) (Miss. Ct. App. 2011). But Kevin presented uncontroverted testimony and documents showing that his income from September 2018 through July 2020 had been negatively affected by material, unforeseen circumstances and that he was unable to pay the amounts ordered. He entered detailed relevant tax returns and his wife was cross-examined on payments made from his and the clinic's bank accounts. Additionally, Kevin testified

21

regarding the contract he was under with the board and his attempts to find work elsewhere. Ladonna entered no evidence to contradict Kevin's presentation. Although he opted to pay other bills, those bills needed to be paid to keep his practice afloat. He depleted his assets and the proof clearly showed he was not a spendthrift or living a lavish lifestyle.

¶45. Moreover, in October 2018, Kevin promptly filed his motion for modification while he was still in rehab, knowing that he was facing a loss of income that would affect his ability to pay. "Where a party promptly files for a modification of support based on his inability to pay, a finding of contempt is not proper." *Evans*, 75 So. 3d at 1087 (¶15). In addition, he filed for modification before Ladonna filed her petition for contempt. In *Thurman v. Thurman*, 559 So. 2d 1014, 1016 (Miss. 1990), our supreme court held that an ex-husband was not in contempt where he filed his motion to modify his child-support obligation before the ex-wife filed a contempt petition, but the ex-husband was still liable for the arrearages.

¶46. Accordingly, we find that there is substantial evidence in the record to support Kevin's defense of inability to pay and we reverse the chancery court's judgment of contempt.

## Conclusion

¶47. Because Kevin proved a material change in circumstances unforeseen at the time of his divorce resulting in a reduction of his income, the chancery court erred in denying Kevin's motion for modification of his alimony payment. That matter is remanded for the chancery court to apply the *Armstrong* factors and determine a reasonable reduced amount

22

of alimony. Because the minor child no longer lives with Ladonna, the chancery court erred in not eliminating Kevin's obligation to pay child support. Moreover, Kevin is entitled to a credit of $12,500 on the total arrearage he owed. Finally, the chancery court's finding of contempt is also reversed because Kevin offered sufficient proof of inability to pay his current child support and alimony obligations.

¶48.    **REVERSED AND REMANDED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. CARLTON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**